S98A0724, S98X0770. TURPIN v. LIPHAM; and vice versa.

(510 SE2d 32)

HINES, Justice.

William Anthony Lipham was convicted of malice murder, rape, armed robbery, and burglary in 1987, and sentenced to death for the murder. This Court affirmed Lipham's convictions and death sentence in 1988, *Lipham v. State*, 257 Ga. 808 (364 SE2d 840) (1988), and the United States Supreme Court denied certiorari. *Lipham v. Georgia*, 488 U. S. 873 (109 SC 191, 102 LE2d 160) (1988). Lipham filed his original petition for a writ of habeas corpus in 1989 and amended his petition in 1990 and 1992. The habeas court issued an order on October 29, 1993, and amended it the following day. This amended order denied all of Lipham's claims except for ineffective assistance of counsel. A ruling on the ineffective assistance of counsel issue was reserved pending an evidentiary hearing scheduled for December 1993. Before the December 1993 evidentiary hearing, Lipham filed another amended habeas petition which raised five additional claims. The habeas court issued a final order in December 1997 which affirmed Lipham's convictions but vacated his death sentence due to ineffective assistance of counsel in the sentencing phase of his trial. The habeas court never addressed the additional claims raised in Lipham's last amended petition. The State appeals the vacation of the death sentence, Case No. S98A0724, and Lipham cross-appeals, Case No. S98X0770. We affirm in part and remand in part.

## Claims That Are Barred

1. Claims that were previously litigated and decided on direct appeal are barred because "[a]fter an appellate review the same issues will not be reviewed on habeas corpus." *Elrod v. Ault*, 231 Ga. 750 (204 SE2d 176) (1974); *Gaither v. Gibby*, 267 Ga. 96, 97 (2) (475 SE2d 603) (1996) (issues raised and decided on direct appeal cannot be reasserted on habeas corpus). The following claims in Lipham's habeas corpus petition were raised and decided on direct appeal: the trial court's denial of his motion to sever the offenses for trial, *Lipham*, 257 Ga. at 811 (4); the challenge to the composition of the grand jury array, id. at 811-812 (5); the denial of his choice for appointed lead counsel, id. at 810-811 (2); the denial of his motion for a change of venue, id. at 811 (3); error in the prosecutor's sentencing phase closing argument, id. at 812-813 (6); and the denial of his motion for directed verdicts of acquittal of the rape and armed robbery charges, id. at 808-810 (1). The habeas court correctly ruled that these claims were barred from habeas corpus review. *Gaither*, supra.

## Claims That Are Defaulted

2. A habeas petitioner who fails to raise an issue that he could have raised on direct appeal defaults the issue on habeas corpus, unless he can meet the cause and prejudice test.

> [A] failure to make timely objection to *any* alleged error or deficiency or to pursue the same on appeal ordinarily will preclude review by writ of habeas corpus. However, an otherwise valid procedural bar will not preclude a habeas corpus court from considering alleged constitutional errors or deficiencies if there shall be a showing of adequate cause for failure to object or to pursue on appeal *and* a showing of actual prejudice to the accused.

*Black v. Hardin*, 255 Ga. 239, 240 (4) (336 SE2d 754) (1985); see also OCGA § 9-14-48 (d). To show cause, Lipham must demonstrate that " 'some objective factor external to the defense impeded counsel's efforts' to raise the claim that has been procedurally defaulted." *Turpin v. Todd*, 268 Ga. 820, 825 (493 SE2d 900) (1997), quoting *Murray v. Carrier*, 477 U. S. 478, 488 (106 SC 2639, 91 LE2d 397) (1986). To show prejudice, he must demonstrate actual prejudice that " 'worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions.' " *Turpin*, supra at 828, quoting *United States v. Frady*, 456 U. S. 152, 170 (102 SC 1584, 71 LE2d 816) (1982). The only exception to the cause and prejudice test is the granting of habeas corpus relief to avoid a "miscarriage of justice," which is an extremely high standard. See *Valenzuela v. Newsome*, 253 Ga. 793, 796 (4) (325 SE2d 370) (1985) ("miscarriage of justice" approaches the situation where the State is imprisoning the wrong person due to mistaken identity).

Lipham raised the following claims for the first time on habeas corpus: the constitutionality of the Unified Appeal Procedure; the constitutionality of OCGA § 17-10-30; double jeopardy arising from his malice murder and armed robbery convictions; the trial court allowing the jury to see a copy of the indictment that included a list of the grand jurors; improper voir dire; erroneous jury instructions; prosecutorial misconduct during the trial; the trial court sentencing Lipham for his crimes other than murder without the benefit of a presentence report; arbitrary discretion by the prosecutor in his decision to seek the death penalty; the mental problems of the defendant precluding his execution on Eighth Amendment grounds; the failure of the prosecution to reveal mitigating information to the defendant; the introduction of an invalid prior felony conviction for impeachment purposes; and the voluntariness of Lipham's inculpatory statement. These claims could have been raised on direct appeal, and

Lipham has not shown sufficient cause to overcome his procedural default. The habeas court thus correctly ruled that these claims are procedurally defaulted. *Black*, supra.

### Ineffective Assistance of Counsel

3. Lipham's claim of ineffective assistance of counsel is neither barred nor defaulted. An ineffective assistance of counsel claim does not need to be raised until trial counsel no longer represents the defendant. *White v. Kelso*, 261 Ga. 32 (401 SE2d 733) (1991). The record shows that Lipham's trial counsel represented him through his direct appeal, and after trial counsel ceased their representation habeas counsel raised this claim at the first available post-conviction opportunity. See id. Therefore, ineffective assistance of counsel is a viable claim.

In order to prevail, Lipham must show both deficient performance by trial counsel and actual prejudice. *Strickland v. Washington*, 466 U. S. 668, 687 (III) (104 SC 2052, 80 LE2d 674) (1984); *Smith v. Francis*, 253 Ga. 782, 783 (1) (325 SE2d 362) (1985). To show deficient performance, he must demonstrate that trial counsel's performance was not reasonable under the circumstances confronting them before and during the trial, without resorting to hindsight. *Strickland*, supra at 689-690; *Smith*, supra. Lipham's burden is high because trial counsel is "strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Strickland*, supra at 690. To show actual prejudice, Lipham must demonstrate that "there is a reasonable probability (i.e., a probability sufficient to undermine confidence in the outcome) that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Smith*, supra.

In its December 1997 final order, the habeas court ruled that Lipham's trial counsel had been ineffective in the sentencing phase due to "a total failure . . . to read, review, interpret, or otherwise utilize the voluminous social and psychological records concerning their client." Lipham spent nine years, from age nine to eighteen, in various institutions including a children's home and mental hospitals. Trial counsel had approximately 2,500 pages of medical, psychological and social records from the Department of Family and Children Services ("DFACS") and the Anneewakee Treatment Center for use at trial. They used two records custodians to introduce the records into evidence, but presented virtually no testimony to explain or distill the records. They presented only one other mitigation witness, the defendant's wife, who briefly pleaded for mercy. Trial counsel then made a few references to the records in closing argument, stated that Lipham's life had come down to "this stack of papers," and exhorted the jury to read the pile of documents during their

deliberations. According to the habeas court, the "cavalier" fashion with which trial counsel used evidence that might reduce the culpability of the defendant for his crimes was defective representation and the records, if properly utilized, would have created a high probability of a sentence less than death. The habeas court therefore vacated the death sentence. With regard to the guilt/innocence phase, the habeas court ruled that the evidence of Lipham's guilt was overwhelming and denied him relief from his convictions.

A claim of ineffective assistance of counsel is a mixed question of law and fact. *Strickland*, 466 U. S. at 698; *Lajara v. State*, 263 Ga. 438, 440 (3) (435 SE2d 600) (1993). The proper standard of review requires that we accept the habeas court's factual findings and credibility determinations unless clearly erroneous, but we independently apply the legal principles to the facts. *Linares v. State*, 266 Ga. 812, 813 (2) (471 SE2d 208) (1996). We affirm the habeas court's ruling upholding Lipham's convictions because he did not show actual prejudice even if his representation was defective. We also affirm the habeas court's vacation of the death sentence because of trial counsel's inadequate investigation and presentation of the mitigation evidence.

A. *The guilt/innocence phase.*

Pretermitting the question of defective representation, we find that the habeas court did not err by ruling that Lipham did not show actual prejudice with regard to his convictions. See *Strickland*, 466 U. S. at 697 (courts need not consider trial counsel's performance on an ineffectiveness claim if no actual prejudice can be shown from counsel's alleged errors). The evidence adduced at trial showed that Lipham entered the home of a 79-year-old woman on the night of December 4-5, 1985. He raped her, killed her, and took some jewelry from her. *Lipham*, 257 Ga. at 808-810. A friend testified that he dropped Lipham off near the victim's house on the night of the murder, and a neighbor of the victim testified that she saw Lipham (who was a stranger) that night in her kitchen. The neighbor's son, who is much bigger than Lipham, told him to leave. The police recovered a .25 caliber pistol that Lipham sold to his brother after the murder; this pistol was determined to be the murder weapon. Witnesses saw Lipham with this pistol before and after the murder; one of the witnesses also testified that she saw Lipham carrying a small bag of jewelry on the morning after the murder and heard him say, "Not bad for a night's work." A pubic hair found in the victim's bedroom was consistent with Lipham's. Lipham confessed that he entered and ransacked the victim's house, but he claimed that another person had used his gun to kill the victim while he was in the victim's bathroom. No witnesses saw this second person with Lipham that night (or any night). We conclude that Lipham did not show a reasonable probability that, but for trial counsel's alleged errors, he would not

have been convicted of the crimes charged. See *Smith*, 253 Ga. at 783 (1). We therefore affirm the habeas court's ruling on Lipham's convictions.

B. *The penalty phase.*

Steve Fanning and Ike Hudson were appointed to represent Lipham and they represented him through his trial and direct appeal. For a few months, a lawyer from New York, Michael Dowd, assisted Fanning and Hudson, but the trial court would not appoint Dowd as lead counsel and Dowd then refused to participate further in the case.[1]

Fanning and Hudson are experienced criminal defense attorneys, and Fanning was appointed lead counsel. He is a charter member of the Georgia Association of Criminal Defense Lawyers and, at the time of Lipham's trial, had tried approximately 150 felony cases, including six murder cases. Fanning had never tried a death penalty case, but he had tried felony cases when there was jury sentencing and thus was familiar with presenting a mitigation case. Fanning & Hudson divided up the trial responsibilities: Fanning was primarily responsible for the guilt/innocence phase and Hudson was primarily responsible for the sentencing phase.

1) *The mitigation investigation.*

Trial counsel[2] were able to obtain Lipham's DFACS records and Anneewakee records but they did not use a psychologist to examine them. Instead, Hudson asked one of his friends, a family counselor named Leslie Van Toole, to do him a favor and look at the records. According to trial counsel, Van Toole reported that the records could both help and hurt the defendant: on one hand, they showed that Lipham had a childhood filled with abuse and neglect; on the other hand, they chronicled Lipham's violent, antisocial behavior from an early age. Van Toole also reported that the records showed that Lipham was not insane or incompetent. Michael Dowd had a psychiatrist, Dr. Schiffman, examine Lipham for competency and insanity and he also reported that Lipham was sane and competent.[3] Based on the determination of competency and sanity and the two-edged nature of the institutional records, trial counsel decided not to hire a

---

[1] Dowd did not become co-counsel in the case because he insisted that he be named lead counsel and refused to accept any limitations on his representation of Lipham. Because the trial court was concerned about having a lawyer act as lead counsel in a capital case who was not a member of the Georgia bar and because Dowd had failed to comply with Uniform Superior Court Rule 4.4, the trial court denied Dowd's request to be lead counsel. Dowd then ceased his participation in the defense. See *Lipham*, 257 Ga. at 810-811 (2).

[2] Fanning and Hudson will be referred to collectively as "trial counsel."

[3] Dr. Schiffman (the psychiatrist that Dowd brought into the case) apparently had no input into the defense beyond an examination of Lipham for competency and sanity. When Dowd ended his involvement with Lipham's defense, Dr. Schiffman's involvement also ceased.

psychologist.

The social and psychological records from Anneewakee and DFACS chronicle Lipham's difficult childhood. Lipham is one of fourteen children born to Hugh and Aline Lipham. Neither of Lipham's parents had more than a sixth grade education; Aline married Hugh when she was only eleven years old. DFACS social records show that Lipham's parents were violent alcoholics who physically abused the children and each other. The family was extremely poor and the Lipham children were severely neglected. A DFACS caseworker reported that the children were malnourished and dirty, and that housekeeping standards were at "the lowest level." DFACS records further show that Lipham's mother did not bathe or clothe the children, and that, once the children were older than infants, she neither disciplined them nor spent much time with them. There was a suggestion that Aline Lipham worked as a prostitute when her husband, a truck driver, was out of town. According to the records, Lipham was not encouraged to do well in school. None of Lipham's older siblings graduated from high school and most had been in youth detention. At an early age, Lipham was following the same path and was reported to have a problem with fighting and acting out. State authorities became involved in the situation but Lipham's parents did not cooperate with DFACS and refused to take responsibility for their actions.

In 1972, when Lipham was nine years old, the state intervened and removed all eight minor children from the Lipham household. The younger children were placed for adoption and the older children, including Lipham, were placed in various foster homes and institutions until they became adults. Lipham never saw some of his siblings again and rarely saw any of them. Lipham's parents effectively abandoned him to the state and made no serious attempt at a reunion. Lipham and his brother Gene were sent to the Anne Elizabeth Shepard Home in Columbus.

By this time, Lipham had severe behavioral problems. He was reported by DFACS to be violent towards the staff and other children, bullying the younger children and antagonizing the older children until they fought with him. In fact, the older children became so exasperated by Lipham's disruptive behavior that they convened a "kangaroo court" and beat him with belts as punishment. An attempt to place Lipham with a foster family failed when he beat the foster couple's son. Lipham was sexually aggressive to other children and even to animals. A report indicates that he once prostituted himself to an adult male. During this time at the Shepard Home, Lipham was struck in the head by a baseball bat (apparently by his brother Gene) and injured. Notes made by social workers and psychologists at the time indicate their concern over Lipham's future. One report warns that, if Lipham is not cured of this behavior, he is headed

"toward a life of destruction and violence." A psychological examination conducted when Lipham was eleven years old reveals a "very deprived child who is about to become institutionalized."

In March 1975, Lipham was admitted to Central State Hospital and in June of that year he was admitted to West Georgia Regional Hospital. Both are mental hospitals. Lipham continued to have problems with fighting and misbehaving. In his discharge summary from West Georgia, it was reported that the institution had failed to teach Lipham respect for others, that he continued to be aggressive and impulsive, and that he lacked a conscience. His prognosis was determined to be poor.

In 1976, when Lipham was 13 years old, he was admitted to the Anneewakee Treatment Center, an institution that treated children for behavioral problems. The admitting psychologist noted the long history of institutionalization and diagnosed Lipham as having an anxiety neurosis and an overanxious reaction to adolescence. The psychologist noted that Lipham's overall IQ was in the high 80s, but that there was a wide disparity between his performance IQ and his verbal IQ. Lipham's performance IQ was over 100, but his verbal IQ was about 25 points lower. Lipham continued to have problems with aggression and lack of impulse control at Anneewakee; he was so disruptive that he was usually not allowed to participate in group therapy or formal educational settings. Other diagnoses during his stay at Anneewakee included conduct disorder and attention deficit disorder; another report suggests a learning disability. There is also a record of another head injury occurring in 1978.

Lipham remained at Anneewakee until he was 18, with his behavior gradually improving. Although Lipham still had problems with impulse control and sometimes argued with the staff, his sexual misconduct ceased and his aggression diminished. Dottie Henson, Lipham's DFACS caseworker, noted in 1981, the year of Lipham's discharge, that she had been afraid to be alone with Lipham when he was a young child but felt comfortable and safe when alone with him as an adult. Lipham left Anneewakee when he was 18 because his state funding support ended. A psychologist noted upon his discharge that his admitting symptoms were in remission, but that future success was greatly dependent upon a structured environment.

2) *The mitigation strategy and presentation of the case.*

Based on Leslie Van Toole's examination of the DFACS and Anneewakee records, trial counsel were concerned that these records were "a loaded gun." According to lead trial counsel, Van Toole had told them that the jury could view the defendant from these records as either a "poor, institutionalized soul from a neglected background or . . . an outright sociopath who only did things for his immediate gratification." Trial counsel considered using Dottie Henson to detail Lipham's early life, but decided to use her as little more than a

records custodian after she made a hostile comment about Lipham during an interview.

Ike Hudson conducted the penalty phase of the trial. He told the jury in his opening statement that he expected to present evidence obtained from Anneewakee, where Lipham was confined from age thirteen to eighteen, that Lipham had been "locked up" as a ward of the state from age nine to eighteen, and that Lipham had come from a "terrible home." The first mitigation witness was Dottie Henson. She established the business records foundation for admitting almost 2,000 pages of DFACS records. She also briefly testified that Lipham and seven of his brothers and sisters had been taken from their parents when he was nine years old due to neglect, that the children had lacked supervision and that they had been allowed to do whatever they wanted. She also related that Lipham had been placed in the Ann Elizabeth Shepard Home, Central State Hospital, West Georgia Regional Hospital, and Anneewakee, until he was released at age18 because state funding was no longer available for his care. She did not go into specifics or provide any information beyond that which is summarized in the previous two sentences. Trial counsel then asked her if the DFACS records portrayed Lipham's life from age nine to eighteen, including his diagnosis. She responded affirmatively, and gave the opinion that the defendant did well at Anneewakee but not in open society. This completed her testimony. The next witness was the Anneewakee records custodian. She only established the business records foundation for the 767 pages of Anneewakee records. The last mitigation witness was Janie Lipham, the defendant's wife. She testified that Lipham had a young son, and pleaded for mercy, saying that their son needs his father.

In his closing argument, Hudson mentioned that the state had assumed custody of Lipham when he was nine years old, and that the story of Lipham's life was contained in the DFACS and Anneewakee records, which he characterized as "large records" and a "lot of paper work." He stated that Lipham had been neglected as a child, that his parents were alcoholics, and that his brothers beat him. He said that Lipham became institutionalized and learned that he only received attention when he behaved inappropriately. Hudson also said that the state bore some responsibility for releasing Lipham before he was ready to live in society. The jury was repeatedly implored to read the records because "it's terrible to think [Lipham's] life comes down to a stack of paper work." He asked the jury:

> Take these records, ladies and gentlemen. *Please read through them, understand them, if you can.* They are the reports of psychologists and psychiatrists. Sometimes they appear to be gobbly-gook, but I think they show that

throughout the course of his life there was one brief glimmer and they recognized that.

Hudson ended his argument with a plea of mercy for his client.

3) *Deficient investigation.*

While trial counsel is afforded tremendous deference over matters of trial strategy, the strategy that is selected must be supported by adequate investigation. See *Turpin v. Christenson*, 269 Ga. 226, 239 (497 SE2d 216) (1998). Before selecting a strategy, counsel must investigate the defendant's background for mitigation evidence to use at sentencing. Id.; *Jefferson v. Zant*, 263 Ga. 316, 319-320 (431 SE2d 110) (1993). An attorney is not ineffective for failing to follow every evidentiary lead; instead, "[t]he adequacy of the scope of an attorney's investigation is to be judged by the standard of reasonableness." *Jefferson*, supra at 319, quoting *Bush v. Singletary*, 988 F2d 1082, 1091 (11th Cir. 1993). The failure to conduct a reasonable investigation may constitute ineffective assistance of counsel. *Curry v. Zant*, 258 Ga. 527, 530 (371 SE2d 647) (1988).

Trial counsel testified that they did not hire a psychologist for use in the sentencing phase because Leslie Van Toole had reviewed the DFACS and Anneewakee records and determined that the records could be both aggravating and mitigating. No other person with mental health training examined these records. However, Van Toole is not a psychologist or a psychiatrist; he has no medical degree or other doctorate degree; he is a family counselor who is not licensed by the state. Hudson testified that he was aware that Van Toole was unlicensed and neither a psychologist nor a psychiatrist; Fanning testified that he thought Van Toole was a psychologist. Hudson testified, when asked by petitioner's counsel why he had not called Van Toole to testify in the sentencing phase: "number one, he wasn't a psychiatrist, he wasn't an expert." In addition, Van Toole testified that he merely reviewed the records in his spare time as a favor to Hudson, that he was not paid or told that he might testify at trial, that he does not believe he saw all the records, and that his review of the records was "by no means in-depth." Most importantly, contrary to trial counsel's testimony, Van Toole testified that trial counsel only told him to look at the records for competence and sanity, not for mitigation evidence. Although the habeas court did not explicitly resolve this conflict in the testimony, it found that trial counsel totally failed to read, review or interpret the institutional records. The habeas record supports these findings, and we must accept the habeas court's factual findings unless clearly erroneous. See *Linares*, 266 Ga. at 813 (2).

Trial counsel's failure to have a mental health expert examine the records for mitigation evidence was not reasonable under the circumstances. Trial counsel knew they had a client who had been insti-

tutionalized in mental hospitals, childrens' homes, and treatment centers for nine years, the entire latter half of his childhood. The 2,500 pages of records generated from these nine years show that Lipham had been subjected to, or diagnosed with, chronic poverty, physical abuse, alcoholic parents, severe neglect, isolation from his family, severe behavioral problems, conduct disorders, anxiety disorders, a possible learning disability, inadequate socialization, head injuries, and a wide disparity between his performance IQ and his verbal IQ. Even though trial counsel made the institutional records the centerpiece of their mitigation defense, they did not hire a mental health expert to investigate and explain the records to them. They also did not contact any of the numerous doctors or psychologists who are identified in the records as having treated Lipham when he was a child. This lack of investigation was not reasonable under the circumstances. See *Christenson*, 269 Ga. at 239-240 (trial counsel ineffective for failing to adequately investigate client's institutional files in their possession); *Curry*, 258 Ga. at 530 (trial counsel ineffective for failing to further investigate client's mental health despite psychological examination which showed that he was "not hitting on all cylinders"). Lipham's habeas counsel presented the affidavits of several psychologists and psychiatrists who testified that test results contained within the institutional records, such as the wide disparity between performance IQ and verbal IQ and the results of a Minnesota Multiphasic Personality Inventory, suggest organic brain damage centered in the left hemisphere and post traumatic stress disorder. According to these experts, this potential mitigation evidence would have been obvious to a trained professional.[4] We conclude that trial counsel's investigation of the available mitigation evidence was not reasonable under the circumstances, and therefore deficient. See *Christenson*, supra.

4) *Deficient presentation of the mitigation case.*

The appropriate test for determining whether trial counsel's performance in the penalty phase was deficient is whether " 'some reasonable lawyer at the trial could have acted, in the circumstances, as defense counsel acted at trial.' " *Jefferson*, 263 Ga. at 318 (3) (a). Our purpose in making this determination is not to grade trial counsel's performance, but simply to ensure that the adversarial process at trial worked adequately. *Jefferson*, supra; *Rogers v. Zant*, 13 F3d 384,

---

[4] We know that it is common practice for post-conviction counsel to file affidavits by witnesses who say they would have supplied additional mitigating evidence, had they been called by trial counsel. See *Waters v. Thomas*, 46 F3d 1506, 1513-1514 (11th Cir. 1995). Usually this "what may have been" strategy does nothing more than confirm the truism, irrelevant from an ineffectiveness standpoint, that everything is clearer with hindsight. Id. at 1514. However, the affidavits by petitioner's experts in this case are significant because they are the *only* mental health experts who examined Lipham's institutional records for mitigation evidence.

386 (11th Cir. 1994). We are therefore highly deferential to the choices made by trial counsel during a trial that are "arguably dictated by a reasonable trial strategy." *Devier v. Zant*, 3 F3d 1445, 1450 (11th Cir. 1993). In this case, trial counsel's performance in the penalty phase was deficient because no reasonable lawyer would have based the penalty phase defense on giving 2,500 pages of raw institutional documents to the jury and asking them, without any guidance, to read through the stack of papers for mitigation evidence.

It is usually true that evidence of a defendant's troubled childhood will present him in a more sympathetic light to a jury. *Devier*, 3 F3d at 1453. Trial counsel obviously believed that Lipham's DFACS and Anneewakee records contained important mitigating information of this nature because they made the records the basis of their mitigation defense. Trial counsel presented only three mitigation witnesses and two of them were records custodians used to get the institutional records into evidence. Other than a plea for mercy from Lipham's wife, no family witnesses testified. No expert witnesses testified either. In addition, only one of the records custodians testified beyond what was necessary to establish the business records foundation, and she only briefly outlined, in a few sentences, what the records contained. Trial counsel then repeatedly implored the jury in closing argument to read and utilize the records during their deliberations.

Trial counsel testified at the habeas hearing that they were concerned that some information in the records could be considered aggravating; for this reason they decided not to have any witnesses interpret these records for the jury. However, this valid concern was not addressed by the trial strategy. The jury, left unguided to comb through voluminous records, was just as likely to encounter aggravating information as mitigating information, i.e., a notation from a nurse about Lipham assaulting another patient versus a memorandum from a DFACS caseworker detailing the terrible neglect that Lipham experienced from his parents.

Further, our examination of the institutional records reveals that it was unreasonable to expect the jurors to digest and understand these records by themselves. The 2,500 pages of records were obviously voluminous; trial counsel characterized the amount of documents as a stack of paper "two feet tall." If the jury was to read at the fast pace of 200 pages an hour, it would still take them over 12 hours to review all the documents. The records included medical records, psychological tests, diagnoses, raw test data, therapy notes, progress notes, incident reports, accident reports, social records, school records, social security records, funding requests, and correspondence. In addition to the sheer volume, the records are difficult to understand. The information recorded by the institutional staffs is filled with wording and abbreviations that were apparently common

to those institutions, but meaningless to an outsider. The average juror would not understand the medical and psychological terms laced throughout the various reports. The raw test data (from the Minnesota Multiphasic Personality Inventory, Wechlser Intelligence Scale for Children, Peabody Picture Vocabulary Test, and the Ammons Full Range Picture Vocabulary Test) and diagnoses (over-anxious reaction to adolescence; anxiety neurosis; and conduct disorder of adolescence, under socialized, aggressive type, in remission) would be utterly incomprehensible to a person without the proper interpretive expertise. Trial counsel specifically asked the jury to read the psychiatric and psychological reports, but the average juror is not able, without expert assistance, to understand the effect Lipham's troubled youth, emotional instability and mental problems might have had on his culpability for the murder. See *Bright v. State*, 265 Ga. 265, 276 (2) (e) (455 SE2d 37) (1995). Lastly, much of the material is difficult to digest due to the simple fact that it is hard to read. For example, the records contain hundreds of pages of hand-written progress notes that vary in legibility depending on the writing style of the doctor, nurse, therapist or counselor who made the notation.

Trial counsel's mitigation defense was simple: they gave the jury virtually their entire mitigation file, about 2,500 pages, and implored them to dig through it and find the mitigation evidence buried inside. They provided no guidance as to where to find this mitigation evidence inside the file, and little guidance as to what it might look like. They specifically told the jury to read the psychiatric and psychological reports but made no attempt to educate the jury about what these reports might mean. Trial counsel's presentation of the mitigation case was not reasonable under the circumstances and constituted deficient performance. See *Christenson*, 269 Ga. at 239-240.

5) *Actual prejudice.*

The habeas court determined that Lipham was actually prejudiced by trial counsel's deficient performance, that but for trial counsel's errors there was a reasonable probability that Lipham would have received a sentence less than death. See *Smith*, 253 Ga. at 783 (1). Although Lipham's crimes are horrific, his mental disorders and the abuse, neglect and isolation he experienced as a child were not adequately presented to the jurors, and thus not reasonably available for their consideration. The habeas court ruled that Lipham met his burden of showing actual prejudice, and we cannot conclude that this ruling was error. Therefore, we affirm the habeas court's vacation of Lipham's death sentence.

## The Remaining Claims

4. Lipham raised five claims in his last amended petition that were never ruled on by the habeas court. The claims are: improper contact between the sheriff and the jurors; suppression of exculpatory information regarding a potential suspect; denial of a fair trial due to the lack of an adequate mental health examination; ineffective assistance of counsel on appeal; and cumulative error. The State asserts that the last amended petition was not timely and should have been dismissed. The State also argues that these claims lack merit or are procedurally defaulted. Because the habeas court never ruled on the timeliness of the last amended petition or on the merits of these claims, we remand these issues to the habeas court for a ruling. Until there is a decision in the habeas court, they are not ripe for appeal. *Zant v. Moon*, 264 Ga. 93, 100 (4) (440 SE2d 657) (1994).

*Judgment affirmed in part and remanded in part. All the Justices concur, except Hunstein and Carley, JJ., who dissent.*

SEARS, Justice, concurring.

I concur fully with the detailed and well-reasoned majority opinion. I write separately to address the following statement made in the dissent:

> The availability of unbridled post-trial inquiry, as sanctioned by the Court today, has transformed Georgia's state habeas proceedings into nothing more than a second trial wherein the habeas petitioner's trial attorney becomes, in effect, the defendant and, if he did not obtain a life sentence for his client, he is presumed to be constitutionally ineffective.[5]

This Court's own records show that since 1995, twenty-eight habeas petitions have been filed in this Court by petitioners who have been sentenced to death for their crimes. Most, if not all, of these habeas petitioners claim that either their trial counsel or their appellate counsel, or both, were ineffective. Of the twenty-eight death penalty habeas petitions filed since 1995, this Court has reversed and remanded *one* habeas appeal on grounds relative to a petitioner's claim of ineffective counsel.[6] Accordingly, the statement in the dissent is untrue.

CARLEY, Justice, dissenting.

William Anthony Lipham raped and then shot the 79-year-old

---

[5] Dissent at 224.

[6] *Turpin v. Todd*, 268 Ga. 820, 831-833 (493 SE2d 900) (1997).

victim in the head. For the murder, a jury sentenced him to death and, on appeal, this Court affirmed his conviction and death sentence. *Lipham v. State*, 257 Ga. 808 (364 SE2d 840) (1988). Lipham sought habeas corpus relief and, after conducting a hearing, the habeas court determined that trial counsel was ineffective in the sentencing phase and vacated Lipham's death sentence. Today, a majority of this Court affirms the habeas court's order. In my opinion, both the habeas court and the majority have simply given lip service to *Strickland v. Washington*, 466 U. S. 668 (104 SC 2052, 80 LE2d 674) (1984), while completely ignoring the controlling principles of that decision. Therefore, I dissent to what I firmly believe is the majority's erroneous affirmance of the habeas court's order vacating Lipham's death sentence.

Lipham has no constitutional guarantee of counsel who would insure that a life sentence would be returned. Under the constitution, he has only the right to counsel who was reasonably likely to, and who did, render him reasonably effective assistance. *McGill v. State*, 263 Ga. 81, 82 (2) (428 SE2d 341) (1993). In determining whether the performance of Lipham's trial counsel passed constitutional muster, the habeas court was not authorized to presume that his attorneys were ineffective simply because a death sentence was returned. To the contrary, the burden was entirely on Lipham to rebut the strong presumption that his trial counsel "rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Strickland*, supra at 690 (III) (A).

The habeas court concluded that trial counsel was ineffective because of his "total failure to read, review, interpret, or otherwise utilize the voluminous social and psychological records concerning" Lipham. I agree with the majority that there is no evidence that trial counsel himself read, reviewed and interpreted the entirety of the voluminous records. However, neither the habeas court nor the majority cite any authority for the proposition that a trial counsel *must personally* read and review each and every record which documents the life of his client to the date of trial. The proper test is "reasonableness under prevailing professional norms." *Strickland*, supra at 688 (III) (A). Under the record before us, there is absolutely nothing to support the conclusion that, in accordance with those professional norms, no reasonable defense lawyer would have failed to read and review Lipham's voluminous records for himself. The appropriate test for determining whether the constitutional right to reasonably effective assistance of counsel

"has nothing to do with what the best lawyers would have done. Nor is the test even what most good lawyers would have done. We ask only whether some reasonable lawyer at trial could have acted, in the circumstances, as defense

counsel acted at trial . . . we are not interested in grading lawyers' performances; we are interested in whether the adversarial process at trial, in fact, worked adequately." [Cit.]

*Jefferson v. Zant*, 263 Ga. 316, 318 (3) (a) (431 SE2d 110) (1993).

The habeas court also incorrectly found that the trial attorneys did not undertake any review and interpretation of Lipham's records, since it is undisputed that counsel did have those records reviewed and interpreted by a family counselor. The majority justifies the habeas court's erroneous finding of the lawyers' "total failure" in this regard on the basis that the family counselor was not an expert. Again, however, there is no authority cited for the proposition that review of a defendant's records by anyone other than an expert is so contrary to prevailing professional norms as to be unreasonable as a matter of law. Moreover, the family counselor reported to Lipham's counsel that the records could show that Lipham was a "poor, institutionalized soul from a neglected background or . . . an outright sociopath who only did things for his immediate gratification." There is no contention that this summary of the records is in any way inaccurate or that an expert would disagree with that assessment. While an expert's review might result in a more detailed report, the lack of detail in the family counselor's assessment does not in any way demonstrate that it was unreasonable. Accordingly, there should be no question that the counselor's accurate, though non-expert, opinion was a reasonable basis upon which the defense attorneys could determine that a further inquiry into the records by an expert was unnecessary.

> [C]ounsel has a duty to make reasonable investigations *or to make a reasonable decision that makes particular investigations unnecessary.* In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all circumstances, applying a heavy measure of deference to counsel's judgments.

*Strickland*, supra at 691 (III) (A).

The habeas court also erred in its finding that there was a total failure on the part of trial counsel to utilize the records. To the contrary, Lipham's lawyer made the tactical decision to introduce the records into evidence and he urged the jury to consider those records in its deliberations. Moreover, counsel presented witnesses who succinctly testified to certain material elements of mitigation contained in the records, such as Lipham's family life and his history of hospitalizations in various institutions. Presumably, the habeas court would have used the records differently than did the attorneys repre-

senting Lipham at the sentencing phase of his trial, and the majority criticizes counsel's performance because, in offering the records into evidence, he did not dwell on specific details of Lipham's life story. However, the lawyers conducting Lipham's defense offered as the explanation for this trial strategy their reasonable belief that following a low-key approach was better than a plan which would accentuate the records and which might prompt the State to stress the aggravating evidence contained therein. Clearly, offering minimal testimony while hoping that the jury would discover the mitigating, but not the aggravating, material in the records was not an unreasonable strategy. Even assuming that whatever different approach the habeas court or the majority might have followed in presenting the information contained in the documentary evidence would have been more effective, there still is nothing to show that the strategy which was actually followed was ineffective. The issue is not whether counsel could have been *more* effective, but whether he was actually ineffective at the time of trial. "There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way. [Cit.]" *Strickland,* supra at 689 (III) (A).

We must accept a habeas court's factual findings unless clearly erroneous. *Linares v. State*, 266 Ga. 812, 813 (2) (471 SE2d 208) (1996). Here, however, the habeas court's finding of trial counsel's "total failure" of performance with regard to the records *is* clearly erroneous, because it is undisputed that trial counsel did *not* fail to make any investigation into and any employment of the records. Thus, the finding of a "total failure" represents no more than the habeas court's subjective opinion that the effort which was made by Lipham's lawyers was not comparable to that which the habeas court itself would have undertaken had it been acting as defense counsel. It is just this sort of erroneous after-the-fact second-guessing by habeas courts that this Court has the obligation to correct.

> [I]t is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. [Cit.] A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.

*Strickland,* supra at 689 (III) (A). Unfortunately, rather than acting to ameliorate the problem, this Court increasingly has become an instrument for perpetuating it. See *Turpin v. Christenson*, 269 Ga. 226 (497 SE2d 216) (1998). In *Strickland,* supra at 690 (III) (A), the

Supreme Court of the United States gave the following warning:

> The availability of intrusive post-trial inquiry into attorney performance or of detailed guidelines for its evaluation would encourage the proliferation of ineffectiveness challenges. Criminal trials resolved unfavorably to the defendant would increasingly come to be followed by a second trial, this one of counsel's unsuccessful defense. . . . Thus, a court deciding an actual ineffectiveness claim *must* judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct.

(Emphasis supplied.) It is apparent that, with this Court's blessing, the predicted dire consequence of failing to maintain a strict adherence to the principles of *Strickland* has now come to pass in Georgia. The availability of unbridled post-trial inquiry, as sanctioned by the Court today, has transformed Georgia's state habeas proceedings into nothing more than a second trial wherein the habeas petitioner's trial attorney becomes, in effect, the defendant and, if he did not obtain a life sentence for his client, he is presumed to be constitutionally ineffective. Because I cannot subscribe to this consequence, I dissent.

I am authorized to state that Justice Hunstein joins in this dissent.

DECIDED NOVEMBER 23, 1998.

*Thurbert E. Baker, Attorney General, Paula K. Smith, Senior Assistant Attorney General,* for appellant.
*Gary A. Alexion, John Youngblood,* for appellee.