S04P0113. FRANKS v. THE STATE.

(599 SE2d 134)

FLETCHER, Chief Justice.

A Hall County jury convicted David Scott Franks of malice murder, armed robbery, two counts of aggravated battery, two counts of cruelty to a child, two counts of aggravated assault, burglary, and theft by taking. The jury found five statutory aggravating circumstances beyond a reasonable doubt and recommended a death sentence for the malice murder of Deborah Diane Wilson. Franks appeals. Finding no reversible error, we affirm the convictions and sentences.[1]

---

[1] The crimes occurred on August 5, 1994. The Hall County grand jury indicted Franks on

1. The evidence at trial showed that Franks was an acquaintance and occasional business associate of Clinton Wilson, the husband of the murder victim. On the morning of August 5, 1994, Clinton Wilson and David Martin visited Franks's pawn shop in Haralson County. The next day, Wilson and Martin were found shot to death on the bottom floor of Franks's pawn shop.[2] They had been shot with a nine-millimeter pistol. The medical examiner testified that the upward trajectory of the bullet wounds in the bodies was consistent with the two victims being shot from behind while lying face-down.

After killing Martin and Wilson, Franks took Wilson's white "cube" van and drove to Hall County to Wilson's house, where Franks believed that Wilson had secretly hidden tens of thousands of dollars. The Wilsons' nine-year-old daughter Jessica answered the door and invited Franks into the home. Franks told Clinton's wife, Debbie Wilson, that he was looking for Clinton and waited with her in the kitchen. At approximately 1:30 p.m., Debbie telephoned David Martin's wife and asked her if she had seen Clinton because "the other David" was at her house looking for him. About this time, the Wilsons' thirteen-year-old son, Brian, returned home, but then left again with a friend.

When Franks said he wanted to go fishing, Debbie sent Jessica to retrieve Brian. While the children were gone, Franks pulled a gun on Debbie and forced her to the upstairs bedroom, where he knew a

January 11, 1995, for malice murder, felony murder, armed robbery, aggravated battery (two counts), aggravated assault (two counts), cruelty to a child (two counts), burglary, and theft by taking. The State filed its notice of intent to seek the death penalty on February 3, 1995. Appeals from two pretrial rulings by the trial court resulted in written decisions by this Court: *Franks v. State*, 268 Ga. 238 (486 SE2d 594) (1997) (granted interim review in which this Court suppressed Franks's post-arrest statement) and *Franks v. State*, 266 Ga. 707 (469 SE2d 651) (1996) (affirming the denial of Franks's motion for discharge and acquittal based on his speedy trial demand). Franks's trial took place from January 7 to February 3, 1998. The jury convicted Franks on all charges on February 2, 1998, and, the following day, found the existence of five statutory aggravating circumstances, OCGA § 17-10-30 (b) (2), (4), (7), and recommended a death sentence for the malice murder conviction. In addition to the death sentence, the trial court sentenced Franks to 20 years for armed robbery, 20 years for each count of aggravated battery, 20 years for burglary, and 10 years for theft, with all sentences to be served consecutively. The felony murder conviction was vacated by operation of law, and the remaining convictions merged with other convictions. Franks filed a motion for new trial on February 11, 1998, and amended it on September 24, 1998, and on December 4, 1998. After the trial court denied Franks's initial motion for new trial, Franks obtained new lawyers and pursued a claim of ineffective assistance of his trial counsel. He litigated a second motion for new trial, which included the ineffectiveness claim, before a different judge because the trial court had recused itself in the interim. The motion-for-new-trial court denied the second motion for new trial on June 16, 2003; Franks filed a motion for reconsideration, which was denied, and then a notice of appeal on July 14, 2003. The case was docketed to this Court on September 23, 2003, and orally argued on January 20, 2004.

[2] This appeal does not involve the charges against Franks arising out of the deaths of Wilson and Martin in Haralson County. The State placed those charges on the dead docket following the imposition of the death penalty for the Hall County crimes at issue in this case.

safe was located. After retrieving money from the safe, Franks stabbed Debbie Wilson in the back and went downstairs to await the children's return. After Franks went downstairs, Debbie called 911, identified her attacker as "David Franks" several times, and stated that he assaulted her for money. She also reported this information to the paramedics who arrived to treat her. She went into cardiac arrest due to blood loss and died before reaching the hospital.

When the children returned to the house, Franks asked Jessica to go to the van and get a briefcase for him, and he told Brian to fetch fishing gear so they could go fishing. While Brian was getting his fishing rod, Franks attacked him from behind and slashed his throat. Brian managed to fight back, cutting Franks on the left arm. Franks then left Brian and stabbed Jessica as she came back in the house. Brian and Jessica were able to escape and run to a neighbor's house; they both survived. Brian and Jessica told the neighbor that their father's friend "David" had attacked them and that he was driving a white cube van. They also described Franks's physical appearance. Later, at the hospital, the children each picked Franks out of a photo lineup. At trial, they identified Franks as their attacker. DNA taken from two bloodstains in the Wilsons' house matched Franks's DNA.

Franks fled the Wilsons' house in the white cube van. Two firefighters responding to the 911 calls observed the van, which had been described on the radio, driving away from the Wilsons' house. They testified that there was a lone man fitting Franks's description driving it. The police found the van abandoned about nine miles away. In and around the van the police found a knife, a blood-stained shirt that Franks had been seen wearing that day, and a bloodstain on the left armrest of the van's driver's seat. A forensic chemist from the state crime lab found that DNA from blood on the shirt and armrest matched Franks's DNA. A canine unit tracked Franks's scent from the abandoned van to a nearby house that had been burglarized. The homeowner's Mazda 626 and some clothes had been stolen.

Franks drove the stolen Mazda 626 to Biloxi, Mississippi, and gambled several thousand dollars over a three-day period in a casino. From the casino, he obtained a player's advantage card, in the name of "Ty Dare." A casino surveillance videotape from August 8, 1994, depicts Franks playing blackjack. Franks then traveled to Mobile, Alabama, and checked into a motel under the name Ty Dare. A Mobile police officer spotted the Mazda 626 in the motel parking lot and responding police officers found, in the room registered to Ty Dare, a nine-millimeter handgun, cash, keys to the Mazda 626, recently purchased clothes, a jacket emblazoned with the name of the Biloxi casino where Franks had been observed gambling, a belt with a letter "D" belt buckle, cowboy boots similar to boots worn by Franks on August 5, and a wallet containing Franks's driver's license, social

security card, and a casino player's advantage card in the name of Ty Dare. The boots and belt had human bloodstains on them but the amount was insufficient for DNA analysis. Franks's girlfriend, Frankie Watts, identified the handgun as similar to the nine-millimeter handgun owned by Franks.[3] The Mazda 626 contained Franks's fingerprints and a bloodstain that matched his DNA. Franks observed the police activity at the motel when he was returning on foot and he fled the scene.[4]

On August 14, 1994, the police arrested Franks at a relative's house in Alabama in possession of a .22 caliber derringer. He had a bandaged cut on his left arm. Before his arrest, he told his relatives that the pawn shop victims were supposed to come up with $100,000 to buy drugs but they did not have the money. He told his brother-in-law that he had an altercation with them and had made them lie on the floor before shooting them; he also said the pawn shop victims "got what they deserved." The State presented evidence that Franks had promised to pay cash to a car dealer on the day of the murders for a Lincoln Town Car he had obtained two days before. There was also evidence that he and his girlfriend planned to close a transaction on some property in Alabama shortly after the murders. At trial, Franks admitted being present at both murder scenes during the killings, but he claimed that other men, who were drug dealers, had killed the victims.

After reviewing the evidence in the light most favorable to the jury's determination of guilt, we conclude that any rational trier of fact could have found Franks guilty beyond a reasonable doubt of the crimes for which he was convicted.[5] The evidence was also sufficient to authorize the jury to find beyond a reasonable doubt the statutory aggravating circumstances that supported his death sentence for the murder of Debbie Wilson.[6]

## INEFFECTIVE ASSISTANCE OF COUNSEL

2. Franks claims that in denying the motion for new trial, the trial court erred by finding that his trial counsel was not ineffective

---

[3] Due to an apparent scheduling conflict, the firearms expert from the state crime lab did not testify until the penalty phase. She testified that bullets and shell casings from the handgun found in the Mobile motel room microscopically matched the bullets and shell casings found near and under the bodies at the pawn shop crime scene.

[4] During the penalty phase, the State presented evidence that Franks walked about a half mile from the motel and entered the home of an elderly couple whom he held at gunpoint for several hours (Franks still had a .22 caliber derringer). When the couple's daughter arrived, Franks stole her car and fled.

[5] *Jackson v. Virginia*, 443 U. S. 307, 319 (99 SC 2781, 61 LE2d 560) (1979).

[6] Id.; OCGA § 17-10-35 (c) (2).

in the preparation and presentation of his case. In order to prevail on a claim of ineffective assistance of counsel, Franks must show deficient performance and actual prejudice.[7] To show deficient performance, Franks must demonstrate that his counsel's performance was not reasonable under the circumstances confronting his counsel at the time, without resorting to hindsight.[8] Trial counsel is "strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment."[9] The test for reasonable attorney performance is

> whether some reasonable lawyer at the trial could have acted, in the circumstances, as defense counsel acted at trial . . . we are not interested in grading lawyers' performances; we are interested in whether the adversarial process at trial, in fact, worked adequately.[10]

To show prejudice, Franks must demonstrate that "there is a reasonable probability (i.e., a probability sufficient to undermine confidence in the outcome) that, but for counsel's unprofessional errors, the result of the proceeding would have been different."[11] A claim of ineffective assistance of counsel is a mixed question of law and fact: we accept the trial court's factual findings unless clearly erroneous, but we independently apply the legal principles to the facts.[12]

A. *Trial counsel's preparation and presentation of Franks's case.* In order to better address the claim of ineffective assistance of trial counsel involving several alleged errors and omissions, we first review the actions trial counsel took in their representation of Franks. Stanley Robbins was appointed in 1994 to represent Franks, and Joseph Homans was appointed as co-counsel in January 1995. Robbins had been an attorney since 1987 and had tried a hundred felony cases. Before Franks's case he had represented two other death penalty clients; Robbins had to withdraw from one case because he had earlier represented one of the witnesses, and the other client pled guilty to avoid the death penalty. Homans had been a lawyer since 1986 and had served as a Hall County assistant district attorney for two years. He had previously represented a defendant facing the

---

[7] *Strickland v. Washington*, 466 U. S. 668, 687 (104 SC 2052, 80 LE2d 674) (1984); *Smith v. Francis*, 253 Ga. 782, 783 (325 SE2d 362) (1985).

[8] *Strickland*, 466 U. S. at 689-690; *Smith*, 253 Ga. at 783.

[9] *Strickland*, 466 U. S. at 690.

[10] *Jefferson v. Zant*, 263 Ga. 316, 318 (431 SE2d 110) (1993), quoting *White v. Singletary*, 972 F.2d 1218, 1221 (11th Cir. 1992).

[11] *Smith*, 253 Ga. at 783.

[12] *Turpin v. Lipham*, 270 Ga. 208, 211 (510 SE2d 32) (1998).

death penalty and that case resulted in the defendant's acquittal. Both lawyers testified that they had some training in death penalty cases. For Franks's case, they sought and received funds to hire an investigator to assist with their investigation.

They met with Franks many times. They testified that they had some difficulty because, although they spent hours trying to convince him to do so, Franks refused to tell them exactly what had happened on the day of the killings. Trial counsel filed numerous pretrial motions, two of which resulted in pretrial appeals to this Court. The trial court denied Franks's motion for discharge and acquittal based on his speedy trial demand, and this Court affirmed.[13] Trial counsel testified that they filed the speedy trial demand to force the State to rush to prepare for trial and to start the Hall County death penalty trial before there were any convictions in the Haralson County pawn shop murders. Robbins believed that it was preferable for evidence of those killings, which would be admissible as part of the same criminal transaction, to come before the Hall County jury as allegations instead of as convictions.[14] Trial counsel also was successful in suppressing a statement made by Franks to an FBI agent after his arrest in Alabama.[15]

Trial counsel testified that they were pessimistic about their chances for an acquittal due to the amount of incriminating evidence. They sought a plea deal with the Hall County district attorney, but she had no interest in accepting a plea deal. Franks had also told trial counsel that he would not plead guilty to avoid the death penalty.

Franks had told his relatives before his arrest that others were involved in the killings and he had insisted to his relatives that he had not harmed Debbie Wilson or her children. Trial counsel's strategy for trial was to focus on these other men and they found some evidence to support this theory. They located a witness who testified that on the morning of the crimes she had seen four men drive into the pawn shop parking lot, get out of their car, and push three men through the door of the pawn shop. They also learned something the State did not know: a phone call had been placed from Franks's pawn shop to the Wilson's house at 1:54 p.m. on August 5 when, according to the State's evidence, Franks was already at the Wilsons' house. They noted that the pawn shop killings seemed deliberate, but the Hall County crimes seemed to have been frenzied. Debbie Wilson had also said on the 911 tape, *"They're* hurting my kids."

---

[13] *Franks,* 266 Ga. at 707.

[14] Homans believed that it would be better to try the Haralson County case first because it was a weaker case and it would be better to see the State put up its evidence one time before having to counter it in Hall County, where the death penalty was more likely.

[15] *Franks,* 268 Ga. at 242.

Evidence that a drug deal had been planned at the pawn shop was going to be admitted. Trial counsel thus formulated a guilt-innocence strategy that portrayed the alleged "drug deal gone bad" at the Haralson County pawn shop as involving other, more dangerous men who had killed Clinton Wilson and David Martin at the pawn shop and then forced Franks to go to the Wilsons' house in Hall County to get cash. Franks had no history of violent crime. Trial counsel planned to argue that Franks may have committed some of the Hall County acts under duress or coercion, but that the other men had committed all three killings. Trial counsel believed they could show deficiencies in the crime scene investigation because potential scientific evidence that could point to the involvement of others was not obtained or preserved. For example, a photograph of the inside of the white cube van showed several plastic ties or "flex cuffs" that could have been used as restraints on Franks, but the police failed to preserve them.

At the start of the trial in January 1998, Franks had still not communicated to trial counsel about the events on the day of the killings. In the guilt-innocence phase, the State presented the evidence as outlined in Division 1 of this opinion. During the cross-examination of several police witnesses, trial counsel tried to show that the crime scenes may have been contaminated or that potentially important evidence had not been preserved. Trial counsel repeatedly questioned police officers about items that had not been tested, such as bloodstains that had not been swabbed, objects that had not been dusted for fingerprints, and items that were not checked for the presence of saliva DNA, such as a pile of cigarette butts in the Wilsons' garage, empty beer cans at the pawn shop, and a soft drink straw in the white cube van. These items, in addition to the "flex cuffs" in the white cube van, were also not preserved by the police. Trial counsel was also able to establish that a number of people had walked through and possibly contaminated the Hall County crime scene before it was processed.

According to trial counsel, after the children had testified and identified Franks as their assailant, Franks finally agreed to tell his lawyers what had happened on the day of the killings. His story was similar to the defense theory: other men involved in the pawn shop drug deal had killed the two men there and forced Franks to go to the Wilsons' house in Hall County to get cash. They had threatened to harm Franks's family if he did not cooperate. The other men had also killed Debbie Wilson. Franks's version included some memory lapses and other information that made trial counsel believe that he should be examined by a mental health expert. Until that point, trial counsel testified that they had seen nothing to indicate that Franks had any mental health problems and his family had told them he had never

before received mental health treatment. They obtained a psychiatrist who examined Franks during the trial. The psychiatrist heard Franks's version of events and diagnosed him with post-traumatic stress disorder.

After the State rested its case in the guilt-innocence phase, Franks testified that he had arranged for a drug deal to take place at his pawn shop on the morning of August 5, 1994, between Clinton Wilson and members of the "Dixie Organization." Wilson was supposed to supply $500,000 to buy the drugs and Franks was supposed to receive $100,000 from Wilson for arranging the transaction. Frankie Watts, Franks's girlfriend, dropped him off at the pawn shop at 8:00 a.m., and Wilson and Martin were waiting for him in the white cube van behind the pawn shop. Eventually, four men from the Dixie Organization arrived in a Cadillac. Franks had never seen any of them before. The apparent leader of the four men was named "Gonzo" and one of the other men was named "Reece." Franks never learned the names of the other two men. While the four men and Wilson were talking, Franks left the pawn shop, walked to a nearby convenience store, and bought a soda. He encountered Watts in the parking lot and they made tentative plans to go to Biloxi; this testimony was consistent with Watts's evidence during the State's case. When Franks returned to the pawn shop, the four men and Wilson were engaged in a heated argument because Wilson had not brought the money. The four men drew guns and threatened to harm Wilson's and Franks's families unless they came up with the money. They made Wilson, Martin, and Franks get on the floor and then either Reece or Gonzo shot Martin and Wilson. The men tied Franks up with the flex cuffs and placed him in the white cube van.

They drove him to the Wilsons' house in Hall County and told him to go inside and make sure it was unlocked so they could get in. Franks was let in the house and talked with Debbie Wilson for a while. Then Gonzo and Reece entered and told Debbie that her husband owed them money. Franks tried to distract the children so they would not be present. In the upstairs bedroom, Franks witnessed Reece stab Debbie Wilson in the back. Franks remembered only lights and sirens after that. He was bleeding, was afraid of the Dixie Organization, and did not trust the police, so he ran away until he came to the house where he stole the Mazda 626. He then went to the casino in Biloxi and the motel in Mobile. He did not remember how the nine-millimeter pistol came to be in his motel room or why he had used the name Ty Dare except that he was afraid to use his real name. He said he was afraid to go to the police because the men from the Dixie Organization had threatened his family. He stated that he had only told his lawyers what had happened ten days earlier. He said he did not remember attacking the children.

Trial counsel presented several other guilt-innocence phase witnesses, including a BellSouth custodian of records who testified that a one-minute call had been placed from the Haralson County pawn shop to the Wilsons' house at 1:54 p.m. on August 5, 1994; the police officer in charge of the Hall County investigation, who was shown a notation in a police report about the Haralson County crimes being possibly related to the "mafia" and involving a large drug deal; Franks's ex-wife, who testified that Franks gets dizzy at the sight of blood; Dr. Connell, the defense psychiatrist, who testified that Franks suffered from post-traumatic stress disorder, which included some amnesia, and opined that he was not malingering; a witness who testified that she was driving by the pawn shop at 9:45 a.m. on August 5, 1994, saw a Lincoln Continental pull into the pawn shop parking lot, and saw four men get out and push three other men through the pawn shop door; and the clerk at the convenience store who testified that she sold a soda to Franks at 10:00 a.m. on August 5, 1994, which corroborated Franks's testimony.

On rebuttal, Frankie Watts repeated her earlier testimony that she had gone into Franks's pawn shop after lunch on August 5, 1994 and that Franks was not there. She added to her earlier testimony by stating that she had picked up the phone and hit redial because she was concerned that Franks was being unfaithful to her. A girl answered the phone and Watts hung up.

In the penalty phase, the State presented victim-impact evidence, the crime lab firearms expert, and evidence about an attempted escape from jail by Franks. A Haralson County police officer testified that he had worked on a multi-county drug task force and had never heard of anyone named Gonzo. The family from Mobile, Alabama, whom Franks held at gunpoint and whose car he stole, also testified. Franks's prior convictions for theft by receiving and conspiracy to commit armed robbery were also admitted.

Franks presented nine mitigation witnesses. Franks's aunt, sister, first wife, brother, former mother-in-law, second wife, cousin, and mother testified that Franks was a kind, gentle, nonviolent person, who was good to his 12-year-old son and to his mother. His aunt stated that Franks's father was a severe alcoholic. His brother stated that their father was an alcoholic and was violent, that he was afraid of his father growing up, and that one time their father had fired a gun in Franks's direction. Franks's mother testified that Franks dropped out of school when he was fourteen years old to help support his family. Franks himself apologized to the victims' families for his involvement in the "dealings we was having that night" and to his family. Trial counsel argued Franks's good qualities and residual doubt about the involvement of others. The jury recommended a death sentence.

B. *Trial counsel's alleged errors and omissions.* Franks claims that his trial counsel's performance was deficient in several areas.

1) *The Guilt-Innocence Phase Closing Arguments. The* <u>Cronic</u> *standard.* Franks argues that trial counsel in the guilt-innocence phase closing argument erroneously conceded his guilt on some of the charged offenses. He avers that this resulted in a complete breakdown of the adversarial process because he had pled not guilty and was entitled to have his lawyer refrain from effectively pleading him guilty without his permission in the argument to the jury. Citing *United States v. Cronic,*[16] he claims that a failure of trial counsel of this magnitude means that prejudice is presumed and a new trial is required.[17]

The record however shows that trial counsel consistently and repeatedly argued that Franks had not committed the murder of Debbie Wilson, the only murder for which Franks was on trial. What trial counsel did say, in discussing the attacks on the children, was that "[t]here's no doubt about what he did to the children," and that Franks was "guilty." When the closing argument is viewed in its entirety, it is clear that trial counsel only conceded that Franks had committed the physical act of attacking the children and that counsel argued that Franks lacked the criminal intent to be convicted of those charges. This argument was not inconsistent with Franks's own testimony. In contrast to Franks's denial on the stand of killing Debbie Wilson, Franks did not deny attacking the children, but had only said he did not remember attacking them.

Although trial counsel's use of the word "guilty" was unfortunate, it is clear that trial counsel did not concede that the jury should convict Franks of *any* crime. Trial counsel instead argued that others had killed the three people that day and forced Franks to go to the Wilsons' house to obtain cash. Trial counsel also argued that Franks suffered from post-traumatic stress syndrome and lacked the criminal intent to be convicted of attacking the children. Trial counsel pointed to evidence adduced at trial that supported this version of events, including that the police fixated on David Franks as the lone assailant due to Debbie Wilson's identification of "David Franks" in her 911 call; the police ignored evidence that could point to the involvement of others; Franks's face on the casino surveillance

---

[16] 466 U. S. 648, 659-661 (104 SC 2039, 80 LE2d 657) (1984).

[17] See *Francis v. Spraggins,* 720 F2d 1190, 1194-1195 (11th Cir. 1983); *Wiley v. Sowders,* 647 F2d 642, 649-651 (6th Cir. 1981); *Nixon v. State,* 857 So.2d 172, 174-175 (Fla. 2003), writ of certiorari granted by *Florida v. Nixon,* 540 U. S. 1217 (124 SC 1509, 158 LE2d 152) (2004).

videotape appears to be devoid of emotion, as if he is in a daze; and that the children had testified that Franks never said a word when attacking them.

Although acknowledging the children's testimony that Franks was the one who attacked them, trial counsel argued, "That's not the whole truth." With regard to criminal intent for the charges against the children, trial counsel argued:

> One of the things [the judge is] going to tell you that's a difficult concept is the idea that in Georgia, and I would think any state in the country, you can't convict anybody of a crime unless you have two things. You have to have the prohibited act and you have to have intent, intent to commit the act. I don't think that's going to be an issue when it comes to the murder of Debbie Wilson, whether he had intent to commit that act, because David has told us he didn't do it.
>
> David told us he was brought up here against his will, he was tied up with a tie just like in the picture. The problem comes with what happened after David snapped and he went back downstairs with the kids. The evidence is convincing, he did that act. I can't tell you he didn't do that act, he can't tell you that. Did he have the intent to do that act? That's something you're all going to have to figure out, and it's tough, it's not easy.
>
> I would submit to you that the evidence is such that you can consider that he did not have the intent to commit that act.

It is therefore clear that trial counsel did not intentionally concede Franks's guilt on any of the charged offenses, including the attacks on the children.

When determining whether the *Cronic* presumption of prejudice applies because trial counsel's argument constituted a breakdown in the adversarial process, "[t]he focus must be on whether, *in light of the entire record*, the attorney remained a legal advocate of the defendant who acted with 'undivided allegiance and faithful, devoted service' to the defendant."[18] The record shows that trial counsel remained a vigorous advocate of Franks's case throughout the guilt-innocence phase closing argument and that he argued that Franks lacked the

---

[18] *United States v. Williamson*, 53 F3d 1500, 1511 (10th Cir. 1995) (emphasis supplied).

requisite mental state to be convicted of the crimes against the children. Trial counsel's argument in this case is distinguishable from the cases cited by Franks where counsel had clearly and unequivocally asserted to the jury that their client was guilty as charged by the government.[19] Therefore, the *Cronic* presumption of prejudice does not apply.

*The Strickland standard.* Although we have determined that the *Cronic* presumption of prejudice does not apply to the guilt-innocence phase closing argument, we must still consider whether trial counsel was ineffective under the standard announced in *Strickland v. Washington.*[20] At the motion for new trial hearing, trial counsel testified with regard to the guilt-innocence phase argument over the charges involving the children, "[T]here were certain acts that we couldn't get away from. The evidence was overwhelming, and it's always been my policy, which has been fairly successful at trial, not to lie to juries or try to sell them something that's patently ridiculous, and I try to make concessions to preserve my credibility and the client's credibility." Both of Franks's trial lawyers testified that they therefore conceded the commission of the acts, but not the requisite mental state when it came to the crimes against the children. Under the circumstances facing counsel at the time we cannot conclude that this strategy was unreasonable.

Franks also claims on appeal that trial counsel was ineffective for calling Franks a "loser" during the guilt-innocence phase closing argument. This statement is taken out of context. When making their argument that Clinton Wilson and David Franks had made the mistake of getting involved with the Dixie Organization, trial counsel had argued that Franks was not a "crime czar[,]" that he and Wilson were just a couple of "small-time losers" who had angered some big-time, dangerous drug dealers. This argument was a reasonable attempt to assert that a drug deal involving Franks that resulted in murder must have involved other, more dangerous individuals. The remainder of the guilt-innocence phase argument tracked Franks's testimony about the involvement of the Dixie Organization and challenged the thoroughness of the police investigation into the crimes. Accordingly, we conclude that trial counsel was not deficient in the closing arguments of the guilt-innocence phase.

---

[19] Compare *Francis*, 720 F2d at 1193, n. 7 ("from the evidence that the State has put up, I think he went in the house and I think he committed the crime of murder"); *Wiley*, 647 F2d at 645 ("They're guilty as charged by the Commonwealth Attorney's office" and "[the prosecutor] has proved to you beyond a reasonable doubt that these gentlemen are guilty of this crime."); *Nixon*, 857 So.2d at 174 ("I think you will find that the State has proved beyond a reasonable doubt each and every element of the crimes charged, first-degree premeditated murder, kidnapping, robbery, and arson.").

[20] 466 U. S. at 687.

2) *The Penalty Phase Closing Arguments.* In the opening statement in the penalty phase, trial counsel told the jury that they would hear mitigating evidence about Franks's life in order to determine the appropriate punishment to "assure that this type of hell on earth never occurs again as a result of any forces placed in motion by David Scott Franks." Franks complains about the "hell on earth" comment as an example of trial counsel's deficient performance, especially since the prosecutor seized on it to argue in closing that a death sentence would prevent this "hell on earth." However, trial counsel revisited the "hell on earth" comment during his closing argument:

> I ask you to choose life without parole, and I ask it for two reasons. One, life without parole by its terms is nothing but a long term or longer term death sentence, because under either sentence David Scott Franks will live the rest of his natural life in prison and die. But during that time he can know his family, and that verdict, that verdict assures that the hell that visited this earth as you've heard described here does not return.

By the sentencing phase, the jury had already convicted Franks of murdering Debbie Wilson and seriously injuring her children. Although trial counsel continued to argue that others may have been involved in the crimes, it was not unreasonable for trial counsel to also acknowledge Franks's convictions and the ordeal undergone by the victims in this case in the context of urging a life without parole sentence, which would also ensure that it would not happen again. The trial court did not err by finding no deficient performance with the closing arguments.

3) *The Alleged Failure to Pursue Plea Negotiations.* Franks claims that his trial counsel was ineffective because they failed to effectively pursue a plea bargain with the State. A plea deal allowing Franks to plead guilty in exchange for a sentence less than death would have required the agreement of both parties. The evidence at the motion for new trial hearing failed to establish that either party was interested in such a deal before trial. Trial counsel testified that they pursued a possible plea bargain with the Hall County district attorney, but the district attorney was not willing to enter into a deal. Homans testified that the district attorney said she needed to hear something "substantial" that would justify such a deal, and they were unwilling to give away information about the possible involvement of other suspects in the event she deemed this to be not substantial and

they had to try the case.[21] Moreover, Homans also testified that Franks had instructed them that he was not interested in pleading guilty to avoid a death sentence. Trial counsel pursued a possible plea bargain and the evidence does not show that a plea offer would have been extended by the State under the circumstances or, if extended, that such an offer would have been accepted by the defendant. Trial counsel's performance was not deficient.[22]

4) *Voir Dire.* Franks complains that his trial counsel was ineffective in their conduct of the voir dire at his trial. He claims that they failed to ask sufficient questions to some prospective jurors, that they failed to move to excuse for cause some prospective jurors for bias against Franks, and that they failed to adequately challenge the removal for cause of some prospective jurors. Trial counsel testified at the motion for new trial hearing that they prepared for death penalty voir dire by studying relevant cases and reading seminar materials. The record shows that the trial court asked all the prospective jurors about their opinion of the death penalty and whether they were able to consider and vote for all three sentencing options. The prosecutor and trial counsel were then given an opportunity to question the prospective jurors about the death penalty and other subjects. Although Franks takes issue with the failure of trial counsel to ask follow-up questions about the death penalty to a few prospective jurors, these jurors had already been questioned about the death penalty by the trial court and there is no indication that further questioning by trial counsel would have elicited favorable responses.

With regard to the prospective jurors Franks claims were improperly retained or improperly excused for cause, the record shows that some of them could only have become alternate jurors and no alternate jurors were needed during Franks's trial. Therefore, any argument concerning these potential jurors is moot because no actual prejudice could have resulted from trial counsel's actions with regard to them.[23] The record also does not show that any other prospective jurors were erroneously qualified or disqualified because of any actions that trial counsel took or failed to take. Accordingly, we find no ineffective assistance of counsel during the voir dire in Franks's trial.

---

[21] Franks had not "opted in" to the Reciprocal Discovery Act (OCGA § 17-16-1 et seq.) in this case so he had no obligation to turn over witness statements and other evidence to the State before trial.

[22] Trial counsel testified that they managed to convince the Haralson County district attorney, who was also seeking the death penalty, to be willing to agree to a plea deal for life without parole or multiple life sentences for the pawn shop killings. However, after Franks received the death penalty in Hall County, the Haralson County district attorney placed the murder charges there on the dead docket.

[23] See *Heidler v. State*, 273 Ga. 54, 57 (537 SE2d 44) (2000).

5) *Trial Counsel's Strategy*. Franks claims that his trial counsel failed to formulate a coherent guilt-innocence phase strategy. However, as previously detailed, trial counsel faced an enormous amount of evidence of their client's guilt and did not have their client's full cooperation until during the trial. Trial counsel formed and implemented a strategy that focused on the involvement of dangerous drug dealers who committed the killings and forced Franks to accompany them to the Hall County crime scene. Trial counsel uncovered witnesses and evidence to support this theory, they strongly challenged the thoroughness of the State's investigation, and the theory was consistent with Franks's trial testimony. They also argued Franks lacked the criminal intent that was necessary for a conviction for the attack on the children. Under the circumstances, we conclude that trial counsel's performance in selecting and pursuing their guilt-innocence strategy was reasonable and, therefore, not deficient.

6) *Trial Counsel's Alleged Conflict of Interest*. Robbins and Homans were appointed to represent Franks on the Hall County charges. Another lawyer was appointed to represent Franks in Haralson County on the two murder charges there, but Franks was not happy with that lawyer, and asked Robbins if he could represent Franks in Haralson County too. Franks had his family contact Robbins and the family agreed to retain Robbins to represent Franks in Haralson County for $25,000.[24] Although the Haralson County crimes were part of the same criminal transaction as the Hall County crimes and would necessarily involve overlapping investigation and litigation, Robbins inexplicably and inappropriately failed to inform the Hall County Indigent Defense Committee that he was being paid by Franks's family for his defense of Franks in Haralson County.[25] Also inexplicably, he did not seek to be appointed to represent Franks in Haralson County even though he knew Franks was indigent.

Franks contends that this fee amounted to a conflict of interest that affected trial counsel's representation of him during the investigation and at trial. However, there is no evidence that Robbins' receipt of a fee from Franks's family for the Haralson County charges distracted him from his zealous representation of Franks or impaired

---

[24] In a later fee arbitration hearing, Robbins was ordered to refund $5,000, which was the amount paid for investigative services, because the arbitrator found that Robbins conducted no investigation in the Haralson County case.

[25] See *Bryant v. State*, 274 Ga. 798, 800 (560 SE2d 23) (2002) (lawyer appointed to represent indigent defendant may commit ethical violation if he also accepts fee to represent same defendant); *Blackshear v. State*, 274 Ga. 842, 843 (560 SE2d 688) (2002) (court appointed lawyer who solicits fee to obtain better result commits ethical violation).

his loyalty to Franks. To prevail on a conflict-of-interest claim when no objection was raised at trial, a defendant must show an actual conflict of interest by his lawyers that " 'adversely affected [their] performance.' "[26] The conflict of interest must be "palpable and have a substantial basis in fact. A theoretical or speculative conflict will not impugn a conviction which is supported by competent evidence."[27] Because Franks failed to show the existence of an actual conflict of interest "with respect to a material factual or legal issue or to a course of action"[28] or how his lawyers' performance was adversely affected by the alleged conflict, he cannot prevail on this enumeration.[29]

7) *Trial Counsel's Mitigation Investigation.* Franks alleges that trial counsel's investigation into his background for mitigation evidence was inadequate. This Court has previously recognized the importance of conducting a reasonable investigation into mitigation evidence to be used at the sentencing phase of a death penalty trial: "before selecting a strategy, counsel must conduct a reasonable investigation into the defendant's background for mitigation evidence to use at sentencing."[30] In *Wiggins v. Smith*,[31] the United States Supreme Court measured trial counsel's mitigation investigation against the 1989 American Bar Association Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases. The Court described these guidelines as "well-defined norms" and noted that they have long been considered as appropriate guides to determining the reasonableness of counsel's performance.[32] The Court in *Wiggins* concluded that trial counsel's mitigation investigation fell short of these standards because trial counsel limited his investigation to a narrow set of sources, did not pursue obvious sources of information, and failed to follow the standard practice of the jurisdiction at the time to have an expert prepare a social history report.[33]

Robbins testified that he and Homans recognized that the evidence against Franks "seemed overwhelming." They therefore recognized that the penalty phase was critical and their ultimate

---

[26] *Lamb v. State*, 267 Ga. 41, 42 (472 SE2d 683) (1996), quoting *Cuyler v. Sullivan*, 446 U. S. 335, 348 (100 SC 1708, 64 LE2d 333) (1980).

[27] *Lamb*, 267 Ga. at 42.

[28] *Cuyler*, 446 U. S. at 356, n. 3.

[29] See *Bryant v. State*, 274 Ga. at 800 (no conflict of interest shown where appointed lawyer improperly also accepted a fee from defendant's family). For similar reasons, Franks's claim that Homans had a conflict of interest because he rented a house to Franks's family during Franks's month-long trial is without merit. Franks failed to explain why this was an actual conflict or how it affected his trial.

[30] *Turpin v. Christenson*, 269 Ga. 226, 239 (497 SE2d 216) (1998).

[31] 539 U. S. 510 (123 SC 2527, 2537-2538, 156 LE2d 471) (2003).

[32] 539 U. S. at 524, 123 SC at 2536-2537.

[33] 539 U. S. at 524-526, 123 SC at 2536-2538.

strategy was to "save his life." Although they had wanted to pursue a strategy in guilt-innocence that other more culpable people were involved, they were not able "to develop the defense to the extent that we wanted to." Nevertheless, the strategy for the penalty phase was to continue to argue that other more culpable people were involved and also to present testimony from family about Franks's good character and alcoholic father.

Shortly after being appointed in 1994, Robbins met with Franks's family and asked about his background, asked for his school records, and asked them to gather pictures of Franks's life.[34] Once Homans was appointed, he was principally in charge of the mitigation phase. Homans testified that he first met Franks's family in February 1997 and asked for information about Franks's background. He did not ask for any records because he believed that Robbins had already made that request; he reviewed the school records but saw "nothing remarkable." Homans talked with Franks's family members over the phone to discuss information to be used at sentencing and shortly before trial, he met with some of the family who would testify at the penalty phase. Trial counsel did not engage any experts to assist in preparing a mitigation case,[35] although they had an investigator who interviewed people in the area where Franks had been raised. They studied seminar materials on mitigation issues. Trial counsel learned from Franks's brother about Franks's violent, alcoholic father; they had their investigator look into Franks's father, who was deceased.

Trial counsel had discussed early in the process having Franks evaluated by a mental health expert, but decided not to engage an expert because they were under the erroneous impression that they could not make an ex parte request for funds, and that anything a mental health expert found would have to be turned over to the State, even if it was adverse to Franks and trial counsel decided not to use it.[36] After having Franks evaluated during trial by a psychiatrist who testified that Franks suffered from post-traumatic stress disorder, trial counsel decided not to offer any additional evidence of post-traumatic stress disorder as a mitigating factor. At the penalty phase,

---

[34] At the motion for new trial hearing, there was a conflict in the evidence regarding trial counsel's contact with family members and the information sought from the family. In denying the motion for new trial, the trial court did not address this conflict and made no factual findings.

[35] Compare *Turpin v. Lipham*, 270 Ga. 208, 219 (510 SE2d 32) (1998) ("average juror is not able, without expert assistance, to understand the effect [of defendant's] troubled youth, emotional instability and mental problems might have had on his culpability for the murder.").

[36] Compare *Brooks v. State*, 259 Ga. 562, 565 (385 SE2d 81) (1989) (indigent defendant's request for funds for expert assistance may be made ex parte); *Bright v. State*, 265 Ga. 265, 276-277 (455 SE2d 37) (1995) (error to deny funds for experts to assist in preparing mitigation evidence).

they presented eight family and former-family members, Franks, and a poster showing pictures of Franks's life.

We need not decide whether trial counsel's investigation for the mitigation evidence was reasonable, because Franks has made no showing that he was prejudiced by the investigation taken.[37] At the motion for new trial hearing, appellate counsel presented no competent evidence of what a more thorough mitigation investigation would have uncovered, and instead relied on a detailed summary and evaluation of Franks's life.[38] However, that summary was not offered into evidence, but was presented to the trial court under seal, with no testimony as to who prepared it, and no showing that it, or the evidence it detailed, would be admissible at a trial. Appellate counsel claimed that this procedure was necessary because ineffective assistance of counsel claims are litigated on habeas corpus,[39] and allowing the State to learn about this information would give it an advantage at a possible retrial. However, this procedure dooms the ineffectiveness claims regarding the mitigation investigation because it prevents the trial court and appellate court from evaluating whether prejudice resulted from trial counsel's alleged failure to uncover and present mitigating evidence. Because Franks failed to offer mitigation evidence that should have been presented at trial, he cannot satisfy his burden of demonstrating prejudice.[40] Therefore, the trial court did not err in denying the motion for new trial on this ground.

8) *The Presentation of Franks's Mental Health Evidence.*

(a) Franks claims that trial counsel conducted a deficient investigation and presentation of his mental health evidence. However, he submitted no additional evidence from any mental health expert at the motion for new trial hearing and instead relies on hearsay. There is no indication in the record that Franks has or had any mental health problems or diagnoses other than what was presented by trial counsel during the guilt-innocence phase. Therefore, Franks failed to show that he was prejudiced by trial counsel's alleged failure to uncover and present any additional mental health evidence.

(b) Franks also claims that the mental health expert had a conflict of interest because in 1994 he had seen the child victims one

---

[37] *Strickland,* 466 U. S. at 697 (court may dispose of ineffectiveness claim solely on prejudice prong).

[38] Compare *Wiggins,* 539 U. S. at 515-516, 123 SC at 2532-2533 (post-conviction counsel presented testimony of licensed social worker who prepared detailed social history).

[39] But see *Williams v. State,* 258 Ga. 281, 288 (368 SE2d 742) (1988) (in direct appeal of death penalty case considering ineffectiveness of counsel); *Hammond v. State,* 264 Ga. 879, 887 (452 SE2d 745) (1995) (same); *Colton v. State,* 266 Ga. 147, 148 (465 SE2d 279) (1996) (same).

[40] *Williams,* 258 Ga. at 288 (where mitigation witnesses do not testify at motion for new trial hearing, defendant cannot establish prejudice stemming from counsel's deficient performance in failing to present those witnesses).

time. Trial counsel testified that it was only during trial when Franks told trial counsel his version of events, which included some memory lapses and a statement that at a certain point everything "went red," that trial counsel became concerned about Franks's mental state.

Trial counsel selected Dr. John Connell, a psychiatrist, with whom they had previously worked and who would be available to evaluate Franks on short notice. Dr. Connell spent about seven hours interviewing Franks and diagnosed him with post-traumatic stress disorder. He testified about this diagnosis at trial, and he informed the jury that this would explain Franks's failure to recall everything that happened on the day of the crimes. Dr. Connell also recited Franks's version of events that day, which was consistent with what Franks had told the jury, and he testified that Franks was not malingering.

On appeal, Franks argues that Dr. Connell had a conflict of interest because he had previously treated the child victims in the case; at trial, the prosecutor argued that Dr. Connell had betrayed the children by testifying. However, Dr. Connell explained that he had not treated the children; he had substituted for an absent colleague in a consultant capacity for a few days in August 1994 when the children were in the hospital. He had briefly spoken with both children in August 1994 and prepared a two-page report, but he had not seen either child since that time. He also explained that he had discussed whether it was improper for him to interview Franks with two other psychiatrists and they had concluded that it was not.

At the motion-for-new-trial hearing, trial counsel testified that they learned about Dr. Connell's contact with the child victims, but they did not believe that this would be a problem; trial counsel also testified that they had very little time as they needed an expert on short notice. They knew Dr. Connell was available and they had worked with him before. Trial counsel's performance is evaluated under the circumstances confronting counsel at the time and their selection of an expert was made under severe time pressure. Franks has not shown that there was another psychiatrist available who would have been willing or able to interview Franks at the jail, as Dr. Connell did, and testify in court within a week's notice. Moreover, Franks does not take issue with the substance of Dr. Connell's testimony, only with the prosecutor's irrelevant and emotional remark in closing argument. Franks has therefore not shown that trial counsel's selection of Dr. Connell was deficient performance.

9) *Alleged Cumulative Error.* Because Franks has not shown ineffective assistance of his trial counsel in any area of his trial, his claim that trial counsel's individual and cumulative errors deprived him of a fair trial is without merit.

OTHER CLAIMS

3. Franks's evidence failed to show that execution by lethal injection is unconstitutional.[41]

4. Franks claims that the State violated *Brady v. Maryland*[42] by not revealing to the defense until her rebuttal testimony that it was Frankie Watts who made the one-minute phone call from the pawn shop to the Wilsons' house on August 5, 1994. In order to prevail on a *Brady* claim, Franks must show:

> that the State possessed evidence favorable to the defendant; the defendant did not possess the evidence nor could he obtain it himself with any reasonable diligence; the prosecution suppressed the favorable evidence; and had the evidence been disclosed to the defense, a reasonable probability exists that the outcome of the proceeding would have been different.[43]

Franks's *Brady* claim fails for several reasons: the evidence that Frankie Watts had made that phone call was not favorable to him; Franks and not the State knew about the call before trial so he and his lawyers were in a better position than the State to learn the identity of the caller; and the State did not suppress this evidence as it was presented at trial.[44]

5. Following Frankie Watts's testimony about her placing the phone call from the pawn shop, Franks sought to challenge her credibility on cross-examination by eliciting that she had been interviewed numerous times by the FBI and police in 1994 without mentioning that she had made that phone call and that she had taken a polygraph test at that time that allegedly indicated deception. The trial court permitted the former questions, but refused to allow questions about a polygraph.[45] On re-direct examination, the prosecutor tried to elicit from Watts that many of these police interviews had occurred when Franks, her then-boyfriend, was on the run before his apprehension. When being questioned about a particular interview with an FBI agent, the following exchange took place:

---

[41] See *Dawson v. State*, 274 Ga. 327, 334-335 (554 SE2d 137) (2001).

[42] 373 U. S. 83 (83 SC 1194, 10 LE2d 215) (1963).

[43] *Mize v. State*, 269 Ga. 646, 648-649 (501 SE2d 219) (1998), quoting *Burgeson v. State*, 267 Ga. 102 (2) (475 SE2d 580) (1996).

[44] See *Pace v. State*, 271 Ga. 829, 838 (524 SE2d 490) (1999) (there is no *Brady* violation when the alleged exculpatory evidence is presented to the jury at trial).

[45] See *Butts v. State*, 273 Ga. 760, 766 (546 SE2d 472) (2001) ("Polygraph evidence, absent the stipulation of the parties, has been consistently and recently held inadmissible in Georgia courts.").

Prosecutor: Were they looking for David Franks?
Watts: When I took the polygraph, is that when you're talking about?

After the conclusion of the re-direct examination, Franks argued that Watts had opened the door to the polygraph evidence. The trial court refused to allow Franks to ask questions about the polygraph test and denied Franks's subsequent motion for a mistrial. We conclude that this brief, non-responsive reference to a polygraph test did not open the door to the cross-examination of Watts about her polygraph test. Additionally, the polygraph reference did not prejudice Franks because it indicated nothing about the results of the polygraph.[46]

6. During the 1998 trial, the trial court charged the jury in the guilt-innocence phase:

You may infer that a person of sound mind and discretion intends to accomplish the natural and probable consequences of that person's intentional acts, and if a person of sound mind and discretion intentionally and without justification uses a deadly weapon or instrument in the manner in which the weapon or instrument is ordinarily used and thereby causes the death of a human being, you may infer an intent to kill.

In 2001, in *Harris v. State*,[47] this Court held that giving such a charge was error. The Court also held that this new rule applied to all cases in the pipeline, which includes Franks's case.[48] Therefore, the trial court erred by giving this charge, but we conclude that the charge was not reversible error under the circumstances. Unlike *Harris*, the evidence of malice was overwhelming in this case and, therefore, it is highly probable that the charge did not contribute to the verdict.[49] The erroneous *Harris* charge was not reversible error.

7. At the beginning of the voir dire process, the trial court inquired of the assembled prospective jurors whether any of them had read, seen, or heard anything about Franks's case. About two-thirds of the prospective jurors, 153 of them, indicated that they had read, seen, or heard something about Franks's case. Franks renewed his motion for a change of venue, arguing that he could not get a fair

---

[46] See *Gulley v. State*, 271 Ga. 337, 348 (519 SE2d 655) (1999).
[47] 273 Ga. 608, 610 (543 SE2d 716) (2001).
[48] Id.
[49] See *Scott v. State*, 275 Ga. 305, 308 (565 SE2d 810) (2002).

trial where so many prospective jurors had knowledge about his case. The trial court reserved ruling on the change-of-venue motion and later announced that it would move the 67 potential jurors[50] who had not heard about the case to the front of the jury venire. Franks did not object. Voir dire then proceeded. Five days later, after approximately 70 prospective jurors had been individually questioned on voir dire, Franks renewed his motion for a change of venue and added the additional argument that the original order of the jury venire be re-instated. Although trial counsel made clear that their main goal was a change of venue, they also, after some debate with the trial court, insisted that the original order of the jury venire be re-instated to preserve the "randomness." The trial court ruled that the objection was late and that they would continue the voir dire and the striking of the jury in the current order.

This ruling was not error. Franks did not object to the altered order of the jury venire for voir dire until five days after the trial court's order making that change, so his belated objection cannot be considered timely so as to preserve this issue for appeal.[51] Moreover, Franks has not shown that he failed to receive an array of impartial, properly drawn prospective jurors from which to pick a jury.[52]

8. The death sentence was not imposed under the influence of passion, prejudice or other arbitrary factor.[53] The death sentence is also not disproportionate to the penalty imposed in similar cases, considering both the crimes and the defendant.[54] The jury found beyond a reasonable doubt five statutory aggravating circumstances: the murder was committed while Franks was engaged in the commission of the aggravated batteries of Brian and Jessica Wilson; the murder was committed while Franks was engaged in the commission of an armed robbery; Franks committed the murder for himself for the purpose of receiving money or any other thing of monetary value; and the offense of murder was outrageously or wantonly vile, horrible, or inhuman, in that it involved depravity of mind and torture.[55] Considering the evidence in this case, the cases listed in the Appendix support the imposition of the death penalty in this case, in that all involve multiple killings, murder committed during armed robbery,

---

[50] Several prospective jurors were excused for hardship reasons between the time the trial court asked about knowledge of the case and its announcement that it would move these jurors to the front of the venire.

[51] See *Page v. State*, 249 Ga. 648, 651 (292 SE2d 850) (1982).

[52] See *Dampier v. State*, 245 Ga. 427, 433 (265 SE2d 565) (1980) (trial court did not err by replacing excused prospective jurors with randomly selected prospective jurors from the back of the venire, rather than the next name on the list).

[53] OCGA § 17-10-35 (c) (1).

[54] OCGA § 17-10-35 (c) (3).

[55] OCGA § 17-10-30 (b) (2), (4), (7).

or the aggravating circumstance involving depravity of mind and torture.

*Judgment affirmed. All the Justices concur.*

APPENDIX.

*Braley v. State*, 276 Ga. 47 (572 SE2d 583) (2002); *Raheem v. State*, 275 Ga. 87 (560 SE2d 680) (2002); *Lance v. State*, 275 Ga. 11 (560 SE2d 663) (2002); *Lucas v. State*, 274 Ga. 640 (555 SE2d 440) (2001); *Rhode v. State*, 274 Ga. 377 (552 SE2d 855) (2001); *Butts v. State*, 273 Ga. 760 (546 SE2d 472) (2001); *Heidler v. State*, 273 Ga. 54 (537 SE2d 44) (2000); *Morrow v. State*, 272 Ga. 691 (532 SE2d 78) (2000); *Gulley v. State*, 271 Ga. 337 (519 SE2d 655) (1999); *Palmer v. State*, 271 Ga. 234 (517 SE2d 502) (1999); *Pye v. State*, 269 Ga. 779 (505 SE2d 4) (1998); *Jenkins v. State*, 269 Ga. 282 (498 SE2d 502) (1998); *DeYoung v. State*, 268 Ga. 780 (493 SE2d 157) (1997); *Raulerson v. State*, 268 Ga. 623 (491 SE2d 791) (1997); *Crowe v. State*, 265 Ga. 582 (458 SE2d 799) (1995).

DECIDED JUNE 28, 2004 —
RECONSIDERATION DENIED JULY 30, 2004.

*Michael Mears, Susan D. Brown, Holly L. Geerdes*, for appellant.
*Jason Deal, District Attorney, Lee Darragh, Assistant District Attorney, Thurbert E. Baker, Attorney General, Patricia B. Attaway Burton, Assistant Attorney General*, for appellee.