[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

————————————————

No. 16-17478

————————————————

D.C. Docket No. 2:11-cv-00325-WBH

DAVID SCOTT FRANKS,

Petitioner - Appellant,

versus

GDCP WARDEN,

Respondent - Appellee.

————————————————

Appeal from the United States District Court
for the Northern District of Georgia

————————————————

(September 16, 2020)

Before WILLIAM PRYOR, Chief Judge, NEWSOM and MARCUS, Circuit
Judges.

MARCUS, Circuit Judge:

Petitioner David Scott Franks was sentenced to death in Georgia for the

murder of Debbie Wilson. Because the facts surrounding the crime were

especially heinous, including two other homicides and the almost fatal attacks on two young children, his trial counsel relied on residual doubt at sentencing. Franks argued in Georgia's state courts that his counsel were constitutionally ineffective at sentencing because they relied on residual doubt and because they failed to investigate and present additional mitigating evidence concerning Franks's childhood, substance abuse, and cognitive deficits. The state habeas court concluded that his attorneys were not ineffective and that Franks was not prejudiced by the failure to introduce what it characterized as weak additional mitigating evidence. The federal district court, in turn, determined that the state court's decisions were neither contrary to nor an unreasonable application of clearly established federal law, nor were they based on an unreasonable determination of the facts, and denied Franks's § 2254 petition. We agree and affirm its judgment.

I.

In the early morning hours of August 5, 1994, David Martin and Clinton Wilson arrived at David Franks's pawn shop in Bremen, Georgia. Like so many of these cases, the details of what transpired between the three men that morning remain murky. But we know that the encounter ended in brutality: Franks shot Martin and Wilson execution-style with a nine-millimeter pistol. A medical

2

examiner concluded from the trajectory of the bullet wounds that the men had been shot from behind while lying face down on the floor.

David Franks fled the scene in Wilson's white cube van.  He drove nearly two hours away to Wilson's home in Gainesville, Georgia, where Franks believed Wilson had hidden tens of thousands of dollars in cash.  Franks was friendly with Wilson and knew his wife and kids -- Franks had even vacationed with the couple. So when he arrived at the Wilson home, Clinton Wilson's nine-year-old daughter Jessica answered the door and allowed Franks to come in.  Franks told Clinton's wife Debbie that he was looking for Clinton, despite knowing that Clinton Wilson lay dead in Bremen.  At around 1:30 p.m., Debbie telephoned David Martin's wife, explained that "the other David" was looking for Clinton, and asked if Martin's wife had seen him.

In an apparent bid to get young Jessica out of the house, Franks told Debbie he wanted to go fishing with Brian, the Wilsons' thirteen-year-old son, who was at a neighbor's home.  Debbie sent Jessica to tell Brian.  With Jessica out of the house, Franks pulled a gun on Debbie and forced her to an upstairs bedroom, where he knew Clinton kept a safe.  After taking money from the safe, Franks stabbed Debbie, piercing a major artery to her lung.  But Debbie did not die just then.  She called 911 and identified her attacker repeatedly as "David Franks," telling the 911 operator that he attacked her for money.  Paramedics eventually

3

arrived to treat Debbie, and she told them the same thing: David Franks attacked her for money. But Debbie's blood loss was too severe. Debbie Wilson went into cardiac arrest and died before reaching the hospital.

After he attacked Debbie, Franks went back downstairs. When the children returned, he told Jessica to go outside to the van to get a briefcase for him and told Brian to get his fishing gear. As Brian was getting his fishing rod, and with Jessica out of the house again, Franks attacked thirteen-year-old Brian from behind, stabbed him in the chest and stomach, and slashed his throat at least twice. Brian fought back and cut Franks on his left arm. The injuries Brian sustained were profound: a five- to six-inch-deep stab wound in the right side of his chest just below the nipple, which penetrated the diaphragm into the abdominal cavity, damaging his lung, diaphragm, and liver; and a wound that penetrated his neck through to the base of his tongue, necessitating the use of a feeding tube for ten days.

Franks left Brian and then targeted nine-year-old Jessica, whom he stabbed in the chest as she came back into the house. Both children survived and escaped to a neighbor's house. They told the neighbor that their father's friend "David Franks" -- whom they physically described -- had attacked them and that he was driving their father's white cube van. At the hospital later, both children picked Franks from a photo lineup.

4

Franks fled his second crime scene in the white cube van, abandoned it, and traveled on foot to a nearby house, where he stole clothing and another car, a Mazda 626. He drove the Mazda to a casino in Biloxi, Mississippi, where he gambled for three days using the pseudonym "Ty Dare." He then traveled to Mobile, Alabama and checked into a Red Roof Inn. A Mobile police officer spotted the Mazda in the motel parking lot and called for a tactical team. Franks saw the police activity on his way back to the motel and fled once more.

After evading police at the motel, Franks invaded the home of Carrie and Willie Cooper. Carrie was 76 years old; Willie was 82, had mobility difficulties, and used a motorized chair to get around. Franks held the couple hostage with no water in their sweltering garage from mid-morning until late in the afternoon, at one point nailing shut a side door to the garage, locking the two inside. The Coopers' daughter, Linda Goodwin, became concerned when she couldn't reach her parents by telephone and went to check on them. Franks then took Goodwin, her husband, and their son hostage too, threatening them with a gun. He finally stole the family's car, but not before ripping all of the telephone lines from the walls of the home.

The police eventually apprehended Franks at his sister's home after his brother-in-law turned him in. When he was arrested, Franks had a .22 caliber derringer and a bandaged cut on his left arm. Before his arrest, he told his brother-

5

in-law that the pawn-shop victims had promised to come up with $100,000 to buy drugs. When they didn't have the money, Franks made them lie down on the floor and shot them. Franks told his brother-in-law that Martin and Wilson "got what they deserved."

Franks was charged in Haralson County, Georgia for the murders of Clinton Wilson and David Martin; he was also charged in Hall County for the offenses that occurred at the Wilsons' home, including the murder of Debbie Wilson. A Hall County jury convicted Franks of malice murder, armed robbery, aggravated battery, cruelty to a child, aggravated assault, burglary, and theft by taking. The trial court sentenced Franks to imprisonment for 20 years for armed robbery, 20 years for each of two counts of aggravated battery, 20 years for burglary, and 10 years for theft, with the sentences to run consecutively. Following the penalty phase, the jury unanimously recommended that Franks be executed; the trial court agreed and sentenced Franks to death for the malice murder of Debbie Wilson. Because he was convicted and sentenced to death in Hall County, Franks was never tried for the murders of Clinton Wilson and David Martin in Haralson County.

After initial motions for a new trial had been litigated and denied but before the case had been appealed, the state trial court granted Franks's trial counsel's motions to withdraw. The court explained that by doing so it would permit the

issue of ineffectiveness of trial counsel to be raised before direct appeal. The following month, the state trial court appointed replacement counsel, who sought a new trial alleging, among other things, constitutionally ineffective assistance of trial counsel.

The state trial court denied that motion, and Franks's convictions and sentence were affirmed on direct appeal. See Franks v. State, 599 S.E.2d 134 (Ga. 2004), cert. denied, 543 U.S. 1058, reh'g denied, 544 U.S. 914 (2005). The Georgia Supreme Court denied the ineffectiveness claim because Franks's new counsel "presented no competent evidence of what a more thorough mitigation investigation would have uncovered," offering only a summary of Franks's life that was neither offered into evidence nor supported by competent testimony. Id. at 148. Put another way, Franks's appellate counsel failed to properly present the claim that trial counsel denied him the effective assistance of counsel.

Franks then filed a petition for a writ of habeas corpus in Butts County Superior Court. Relevant to the claim now before us, Franks argued that his trial counsel were constitutionally ineffective for failing to investigate and present additional mitigating evidence about Franks's difficult childhood and abusive father, his substance abuse, his cognitive deficits and mental illness, and for relying instead on a theory of residual doubt. Moreover, he claimed his appellate counsel were ineffective for failing to properly raise that claim. Following an extensive

evidentiary hearing, the state habeas court denied Franks collateral relief. See

Franks v. Hall, No. 2005-V-1070 (Butts Cty. Super. Ct. Apr. 27, 2010). The court

concluded that Franks's claim concerning ineffectiveness of trial counsel could not

be reviewed either because of res judicata or procedural default. Id. at 12. It

noted, however, that Franks's claim about appellate counsel's ineffectiveness was

properly presented and that, in the course of reviewing it, the court would

necessarily have to examine trial counsel's performance as well. Ultimately, the

state habeas court concluded that because trial counsel were not ineffective,

appellate counsel were not deficient, nor was Franks prejudiced by their failure to

challenge trial counsel's mitigation investigation and presentation.

Franks next set his sights on federal court, filing this § 2254 petition in the

United States District Court for the Northern District of Georgia. Like the state

habeas court, the district court examined whether Franks's trial counsel were

constitutionally ineffective on the theory that if trial counsel were not ineffective,

appellate counsel could not have been ineffective either for failing to raise a claim

about trial counsel's performance. Applying the deference mandated by the

Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), the district

court concluded that none of the state habeas court's factual findings were

unreasonable in light of the evidence presented, and none of its conclusions of law

were contrary to or involved an unreasonable application of clearly established federal law.

> We granted a certificate of appealability limited to one claim:

> Whether appellate counsel provided ineffective assistance in violation of the Sixth Amendment to the United States Constitution by failing to present evidence to support the claim that trial counsel was ineffective in violation of the Sixth Amendment to the United States Constitution when at the penalty phase of trial, it failed to conduct a reasonable mitigation investigation and failed to uncover and present mitigation evidence.

> The only claim properly before us, then, is whether Franks's appellate counsel were ineffective in presenting his claim of ineffectiveness of trial counsel at the penalty phase. Because his appellate counsel did not properly present the ineffective assistance of trial counsel in the motion for a new trial, and because the state habeas court concluded it was bound by res judicata or procedural default on claims related to the ineffectiveness of trial counsel, that claim, as a procedural matter, is unexhausted in state court. However, we have repeatedly held that if a particular claim itself is without merit, "any deficiencies of [appellate] counsel in failing to raise or adequately pursue" it "cannot constitute ineffective assistance of counsel." Owen v. Sec'y for Dep't of Corr., 568 F.3d 894, 915 (11th Cir. 2009). "In other words, whether appellate counsel failed to properly challenge trial counsel's mitigation inquiry focuses on essentially the same corpus of evidence and the same legal questions underlying trial counsel's effectiveness -- which

9

strategies did trial counsel pursue, were those strategies reasonable under the circumstances, and what kinds of penalty-phase evidence was developed, or could reasonably have been developed." Ferrell v. Hall, 640 F.3d 1199, 1225 (11th Cir. 2011).

Thus, we, like the state habeas court and the district court too, consider whether Franks's trial counsel were constitutionally ineffective. Since Franks's claim that his trial counsel were constitutionally ineffective is without merit -- particularly when measured against AEDPA deference, and particularly after the state habeas court held a lengthy evidentiary hearing and made extensive findings on the reasonableness of trial counsel's strategic choices and on prejudice -- we have no occasion to evaluate the performance of his appellate counsel directly. His appellate counsel could not have been constitutionally ineffective by failing to present a meritless claim.

## II.

"We review de novo a district court's grant or denial of a habeas corpus petition." McNair v. Campbell, 416 F.3d 1291, 1297 (11th Cir. 2005). Because Franks filed his federal habeas petition after April 24, 1996, this case is governed by AEDPA. "Under AEDPA, if a state court has adjudicated the merits of a claim -- as the state court did here -- we cannot grant habeas relief unless the state court's decision 'was contrary to, or involved an unreasonable application of, clearly

established Federal law, as determined by the Supreme Court of the United States,' or 'was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" Kilgore v. Sec'y, Fla. Dep't of Corr., 805 F.3d 1301, 1309 (11th Cir. 2015) (quoting 28 U.S.C. § 2254(d)).

"Under § 2254(d)(1)'s 'contrary to' clause, we grant relief only 'if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts.'" Jones v. GDCP Warden, 753 F.3d 1171, 1182 (11th Cir. 2014) (alterations in original) (quoting Williams v. Taylor, 529 U.S. 362, 413 (2000)). "Under § 2254(d)(1)'s 'unreasonable application' clause, we grant relief only 'if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.'" Id. (alteration in original) (quoting Williams, 529 U.S. at 413).

The second prong of § 2254(d) -- that an adjudication resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state-court proceeding -- "requires that we accord the state trial court substantial deference." Brumfield v. Cain, 576 U.S. 305, 314 (2015). "If '[r]easonable minds reviewing the record might disagree about the finding in question, on habeas review that does not suffice to supersede the trial

11

court's . . . determination.'" Id. (alteration and ellipsis in original) (quoting Wood v. Allen, 558 U.S. 290, 301 (2010)). Indeed, on AEDPA review, "a determination of a factual issue made by a State court shall be presumed to be correct" -- a presumption that the petitioner carries the burden of rebutting "by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

### III.

To properly analyze the state habeas court's findings of fact and conclusions of law concerning the effectiveness of Franks's trial counsel -- and thus whether his appellate counsel could have been ineffective for failing to support the claim -- we detail the guilt-phase and sentencing-phase strategy and presentation made by Franks's trial counsel. Although the guilt-phase performance of trial counsel is not before us, the guilt-phase presentation is critical to understanding trial counsel's mitigation strategy, which focused primarily on the theory of residual doubt.

It is undeniable that Franks's trial counsel faced overwhelming evidence of their client's guilt. In addition to Debbie Wilson's 911 calls and the Wilson children's positive identification of Franks as their attacker, two firefighters responding to Debbie Wilson's 911 calls observed a man matching Franks's description driving away from the Wilsons' home in the white cube van. Police found the abandoned van about nine miles away from the Wilson home, along with a bloodstained shirt Franks had been seen wearing that day, a knife, and what was

later identified as Franks's blood on the left armrest of the vehicle. The Wilson children testified at trial; they recounted the brutal attacks and identified Franks as their assailant. And testing of two bloodstains in the Wilsons' home confirmed the presence of Franks's DNA.

Franks's defense was that other men had murdered Debbie, and that the attacks on the children, if he did them, were the result of coercion. Testifying on his own behalf, Franks told the jury that he had set up a drug deal between Clinton Wilson and members of a criminal organization -- the "Dixie Organization." Franks said he had been drinking and using crank (a methamphetamine) with Wilson the previous night; the two picked up David Martin, and at around 4 a.m. the three of them went to eat at a truck stop diner. Franks went to sleep for a few hours at his girlfriend's mother's house, and then met Wilson and Martin at his pawn shop in Bremen -- one of two pawn shops Franks owned -- in the morning. Franks claimed that four men from the Dixie Organization arrived at the pawn shop, and Franks went to a convenience store to buy a soda and talk to his girlfriend. Franks said that when he returned, Wilson and the Dixie Organization men were arguing because Wilson had not produced the cash required for a planned drug deal. Franks claimed that the men pressed them for the money; they also threatened to kill Franks's mother. The men forced Martin, Wilson, and Franks to lie face down on the floor; they then shot Martin and Wilson with a gun

13

the men had found in Franks's briefcase in his pawn shop. All the while Franks was "begging for [his] life."

The four men then tied up Franks with flex cuffs and placed him in Wilson's van. They drove Franks to Wilson's home and told him go inside and make sure that they could get in. After Franks talked with Debbie Wilson for a while, two of the men came into the home and told Debbie that her husband owed them money. Franks testified that he tried to distract the Wilson children. Franks claimed that he saw one of the men (Reece) stab Debbie in the back after taking her upstairs to the safe. Franks said that the next thing he remembered was seeing lights and hearing sirens. He could not remember the attacks on the children. He fled the scene because he feared the Dixie Organization; he did not go to the police immediately because "[t]hese people [were] very well connected in all areas, and [he] didn't trust the police or anyone else at that time."

Franks could not recall many details of the days following the triple homicide, but he remembered gambling in Biloxi and abandoning his belongings at the Red Roof Inn in Mobile when he saw police cars outside the motel. He also admitted to the encounter with the Coopers. He said that he first tried to buy the Coopers' truck but, when they refused, he forced the couple into their garage and nailed the door shut. He then stole their daughter's car to get away yet again. Eventually, he went to his sister's home and remembered meeting his brother-in-

14

law, Wayne McConathy, though he claimed not to recall what he told McConathy. When asked why he went to a casino in Biloxi and why he used the name Ty Dare, Franks offered only that perhaps the casino presented familiar surroundings, and that he was scared to use his own name.

Finally, his counsel asked: "David, you've seen the evidence regarding the slashing of the two kids, you've seen the pictures, you've heard their testimony. Are you telling this jury that you didn't do that?"  Franks responded, "All I can say is I just don't remember that. . . . I'm just saying I don't remember it.  I don't remember that event."

Franks's counsel presented several other pieces of evidence to support his account that four men from the Dixie Organization were involved and had murdered Debbie Wilson.  One witness (Annie Carlisle), who was driving by Franks's pawn shop on the morning of the murders, saw four men drive into the parking lot, exit their car, and push three other men through the door of the pawn shop.  Moreover, telephone records revealed that a phone call was placed from Franks's pawn shop in Bremen to the Wilson home two hours away in Gainesville at 1:54 p.m. on the day of the crimes.  Because the state's timeline put Franks at the Wilson home by 1:30 p.m., defense counsel argued this phone call demonstrated that others were involved in the crimes.  His counsel also emphasized the difference between the crime scene found at the pawn shop in

15

Haralson County and the scene at the Wilson home in Hall County. The pawn shop killings were methodical, gang-like executions, but the Hall County crimes were frenzied. Defense counsel also argued that Debbie Wilson's 911 calls strongly suggested other people were involved because Debbie Wilson told the 911 dispatcher three times that "they're hurting my kids." The defense also presented evidence that the crime scenes may have been contaminated, important evidence not preserved, and certain items not tested, suggesting that the police failed to exhaust the search for other suspects. Among other things, the investigators failed to identify fingerprints found on beer cans recovered from the pawn shop and failed to even so much as investigate tire tracks left at the Wilson home on the day of the crimes.

At the penalty phase, the state's aggravation case grew still stronger. Debbie Wilson's family testified about the impact her death had on all of them and the impact the attacks had on the children. A firearms examiner said that the bullets at the Haralson County crime scene matched Franks's gun recovered from the Red Roof Inn. Two Haralson County Sheriff's Department officers recounted Franks's attempted jail escape after he was finally arrested for the crimes, explaining that he shattered a jail window with a screwdriver. Further, Carrie Cooper and her daughter testified about being held hostage and threatened by Franks.

16

Franks's counsel primarily relied on residual doubt -- a doubt they attempted to create during the guilt phase. But they also presented significant mitigation testimony from eight family members: Jane Mashburn (Franks's aunt), Susan McConathy (Franks's sister), Nancy Rowell (Franks's ex-wife), Calvin Franks (Franks's brother), Mildred Rowell (Franks's ex-mother-in-law), Lynette Dickinson (Franks's second wife), Patty Murch (Franks's cousin), and Doris Franks (Franks's mother). Mashburn testified to David Franks's good character and explained that his father was "a severe alcoholic" who physically abused David's mother. Nancy and Mildred Rowell, McConathy, Dickinson, Murch, and Doris Franks each similarly testified about David's good character. All of this good character evidence supported residual doubt: David had never been known to be violent and each account of his decency was designed to sow more doubt in the jurors' minds that Franks went into a violent frenzy.

The defense did not rely solely on good character. Counsel also introduced some mitigating evidence about David's troubled childhood. David's older brother, Calvin Franks, testified that "David's childhood was not exactly a ros[y] one." He described their dysfunctional childhood this way:

> We came from a violent family, and our dad, as has already been
> stated, he was very much so an alcoholic, an unreasonable man that
> you could not talk to, you couldn't have friends over, at any -- I used
> to sleep with a knife in the head of my bed, I was afraid of my dad. I
> was afraid he would come in and kill me when I was a child. I've had
> conflicts with my dad telling him that he would not do my younger

17

brother as he did myself.  My mother is a very religious woman.  She -- to the point I've seen her do without food for days fasting and praying.  My sister is likewise.  We were, if you'll pardon the expression, we were very much black and white.  One side of my family was -- would die before they would tell you a lie, and the other side of my family was the devil himself.  So there was a lot of confusion growing up.  I've even seen -- there was a time when my mom and David was sitting on the couch and my dad shot right between them while they were sitting on the couch, it came so close to my mom's leg it actually burnt her leg.  If we were a family today they would take David and I and my sister away from my mom and dad and give us to somebody else . . . .

In closing argument at the penalty phase, the prosecutor detailed the aggravating circumstances, highlighting the terror and torture of Brian and Jessica Wilson, orphaned, hospitalized, and fearful for their lives as David Franks eluded law enforcement after the crimes, and the horror experienced by Debbie Wilson, who lay dying while hearing the attacks on her children.  Franks's counsel countered with residual doubt, telling the jury, "I submit to you that one of the factors that you need to consider here is the proof in the case, and whether questions will come zinging back to you when you're in that quiet place alone with your thoughts and you say what if?  What if?  Or why?"  His counsel detailed holes in the state's case -- including the unidentified fingerprints, tire tracks at the scene that were never tested, and Franks's behavior fleeing the scene onto the street rather than running into the nearby woods -- as well as evidence supporting David's account that other men were involved in the homicide, such as the testimony of Annie Carlisle.  Ultimately, he asked the jury to "sprinkle mercy"

18

rather than "revenge and vengeance" into their deliberations and concluded: "I beg you ladies and gentlemen, don't kill that man."

The jury unanimously recommended that Franks be sentenced to death for the murder of Debbie Wilson. It found five statutory aggravating factors beyond a reasonable doubt: (1) the murder of Debbie Wilson was committed while Franks was engaged in the commission of the aggravated battery of Brian Wilson, Ga. Code Ann. § 17-10-30(b)(2); (2) the murder of Debbie Wilson was committed while Franks was engaged in the commission of the aggravated battery of Jessica Wilson, id.; (3) the murder was committed while Franks was engaged in the commission of an armed robbery, id.; (4) Franks committed the murder for the purpose of receiving money or any other thing of monetary value, id. § 17-10-30(b)(4); and (5) the murder was outrageously or wantonly vile, horrible, or inhuman, in that it involved depravity of mind and torture, id. § 17-10-30(b)(7).

Franks now says his trial counsel were ineffective at the penalty phase because they relied on a residual doubt defense, and because they failed to investigate and present additional details about David's difficult childhood, substance abuse, and cognitive deficits. After a three-day evidentiary hearing, the state court denied Franks's habeas petition. The court found that "trial counsel made a reasonable, strategic decision to present character evidence and a residual doubt theory at the sentencing phase of trial," and that this strategic decision was

supported by a reasonable investigation that included extensive interviews with Franks's family and friends, and the examination of "possible mental health history, dependency issues and other extenuating factors." Particularly, the court concluded that "trial counsel made a reasonable, strategic decision to focus on residual doubt as their mitigation theory after a thorough investigation of 'law and facts.'" The state habeas court reviewed the additional mitigating evidence introduced collaterally -- evidence we detail in Section IV below -- and concluded both that counsel made a reasonable strategic choice not to present it and that the evidence was weak and would have had little mitigating value. Thus, Franks was not prejudiced by the choice to omit it. The district court, in turn, concluded that the state habeas court's denial of the petition was neither contrary to nor an unreasonable application of clearly established Supreme Court law, nor were any of its factual findings unreasonable in light of the evidence presented.

IV.

Under Strickland v. Washington, 466 U.S. 668 (1984), a petitioner must show that his counsel's performance was constitutionally deficient -- that his counsel "made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment" -- and that the deficient performance prejudiced the defendant, depriving him of a "fair trial, a trial whose result is reliable." Id. at 687. Simple mistakes or strategic errors are not enough,

20

nor are serious errors if, absent those errors, there is no "reasonable probability"

that the outcome would have been different.  Id. at 694.  "A reasonable probability

is a probability sufficient to undermine confidence in the outcome" -- in this case, a

probability sufficient to undermine confidence that the jury would have

recommended death.  Id.

In other words, Franks must show that: (1) "counsel's representation fell

below an objective standard of reasonableness," and (2) "there is a reasonable

probability that, but for counsel's unprofessional errors, the result of the

proceeding would have been different."  Id. at 688, 694; accord Knowles v.

Mirzayance, 556 U.S. 111, 124 (2009); Wiggins v. Smith, 539 U.S. 510, 521

(2003); Williams, 529 U.S. at 390; Darden v. Wainwright, 477 U.S. 168, 184

(1986).  The failure to meet either Strickland prong is fatal to the claim.

## A. Franks's Trial Counsel's Performance Was Not Constitutionally Deficient.

"Judicial scrutiny of counsel's performance must be highly deferential."

Strickland, 466 U.S. at 689.  We apply a "strong presumption" that counsel

performed competently and ask only whether any "identified acts or omissions

were outside the wide range of professionally competent assistance."  Id. at 689–

90.  And our review under AEDPA is doubly deferential: we extend deference both

to the trial counsel's choices and to the state court's assessment of their

reasonableness.  "The pivotal question is whether the state court's application of

21

the <u>Strickland</u> standard was unreasonable," which is "different from asking whether defense counsel's performance fell below <u>Strickland</u>'s standard." <u>Harrington v. Richter</u>, 562 U.S. 86, 101 (2011). Indeed, "evaluating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." <u>Yarborough v. Alvarado</u>, 541 U.S. 652, 664 (2004). Because <u>Strickland</u> allows for a range of strategic choices by trial counsel, so too is there considerable leeway for state courts to determine the reasonableness of those choices. "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." <u>Harrington</u>, 562 U.S. at 101 (quoting <u>Yarborough</u>, 541 U.S. at 664). For Franks to prevail, then, he would have to show that <u>no</u> reasonable jurist could find that his counsel's performance fell within the wide range of reasonable professional conduct.

"The question of whether an attorney's actions were actually the product of a tactical or strategic decision is an issue of fact, and a state court's decision concerning that issue is presumptively correct." <u>Provenzano v. Singletary</u>, 148 F.3d 1327, 1330 (11th Cir. 1998). On the other hand, "the question of whether the strategic or tactical decision is reasonable enough to fall within the wide range of professional competence is an issue of law not one of fact." <u>Id.</u> If fairminded

22

jurists could disagree as to whether trial counsel's strategic choices were reasonable, a petitioner is not entitled to federal habeas relief. Moreover, "[s]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." Knowles, 556 U.S. at 124 (quotation omitted); see also Nance v. Warden, Ga. Diagnostic Prison, 922 F.3d 1298, 1302 (11th Cir. 2019) ("It is especially difficult to succeed with an ineffective assistance claim questioning the strategic decisions of trial counsel who were informed of the available evidence."). When trial counsel fails to discover mitigating evidence, we ask whether the decision not to investigate further was reasonable. Strickland, 466 U.S. at 690–91 ("[S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary."); see also Wiggins, 539 U.S. at 527–28 (finding ineffective assistance because "counsel chose to abandon their investigation at an unreasonable juncture, making a fully informed decision with respect to sentencing strategy impossible").[1]

---

[1] We note at the outset that Franks had experienced trial counsel who each had at least some familiarity with death penalty cases in particular. "When courts are examining the performance of an experienced trial counsel, the presumption that his conduct was reasonable is even stronger." Chandler v. United States, 218 F.3d 1305, 1316 (11th Cir. 2000) (en banc); see also Spaziano v. Singletary, 36 F.3d 1028, 1040 (11th Cir. 1994) ("[T]he more experienced an attorney is, the more likely it is that his decision to rely on his own experience and judgment in

1. Reliance on Residual Doubt

Franks first says it was constitutionally deficient for his counsel to rely on residual doubt at sentencing, despite the overwhelming evidence of Franks's guilt. Defense counsel testified both at the hearing on the motion for a new trial and at the collateral state habeas hearing that residual doubt was a strategic choice. Counsel didn't mince words about the defense thinking: "our theory on sentencing was you can put in whatever you want, strong about David or weak about David personally," but "[g]iven these sets of facts and given what happened to the children, if you're unable to point out residual doubt, you're going to lose the penalty phase."

Franks says the state habeas court's conclusion about residual doubt was contrary to or an unreasonable application of clearly established federal law. We are unpersuaded. "We have said before that focusing on acquittal at trial and then on residual doubt at sentencing (instead of other forms of mitigation) can be reasonable." Chandler, 218 F.3d at 1320. It is true that we have also said this is

---

rejecting a defense without substantial investigation was reasonable under the circumstances." (quotation omitted)). Experienced litigators Stanley Robbins and Joseph Homans, aided by investigator Andrew Pennington, represented Franks at trial. Robbins and Homans had each been practicing law for more than a decade. Robbins had tried over one hundred felony criminal cases and had been involved in multiple death penalty cases, though he had never tried one. Homans had worked in the district attorney's office for several years and had defended a number of murder trials as appointed defense counsel. Homans had tried one death penalty case, which resulted in acquittal and did not proceed to the penalty phase, but he had "fully participated" in preparation for sentencing.

especially so when the evidence of guilt is not overwhelming.  But the brutal and aggravated nature of this crime -- particularly the attacks on Debbie Wilson and her two young children, following on the heels of the double homicide at the pawn shop -- could lead a reasonable attorney to conclude that without residual doubt, a life sentence would be difficult to sustain.  Moreover, the story Franks told at trial was supported by some additional evidence: Carlisle's testimony that at the pawn shop she saw four men push three others inside; the phone call from the pawn shop at the time of the crimes in Gainesville; Debbie Wilson's frantic calls to the 911 operator when she exclaimed three times that "they're hurting my kids"; additional, unidentified fingerprints at the crime scenes; and the disparity between the calculated, gang-like killings in Bremen and the frenzied crime scene at the Wilsons' home.  Given the horrific facts surrounding these crimes and the availability of some extrinsic evidence supporting Franks's account, a reasonable jurist could conclude that a reasonable lawyer could have performed the way Franks's trial counsel performed.

2. Cognitive Deficits

Franks argues next that it was unreasonable for trial counsel to neither hire a mental health expert nor present mitigating mental health evidence at sentencing. In preparation for sentencing, defense counsel hired a well-known and experienced mitigation investigator, Andrew Pennington, who had been a police officer and

worked with one of Franks's attorneys in a previous death penalty case. Pennington interviewed Franks and his family extensively; he was never given any indication that Franks's mental health required further investigation. Indeed, the state habeas court found that the defense team went "very in depth" with Franks's mother concerning his childhood and spoke "very frequently" with his aunt, Jane Mashburn. The state habeas court found that "[t]rial counsel were not given the names of any treating doctors or hospitals," that their investigator "did not come across any relevant medical records during his investigation," and that neither Franks's family nor Franks himself ever gave any indication that there were any mental health issues. The state habeas court also found that "trial counsel made the determination not to hire a mental health expert to evaluate [Franks] prior to trial as they concluded, after a thorough investigation, that they did not have a good faith basis to request such an evaluation."[2] The court concluded that trial counsel

---

[2] Franks's counsel also testified, however, that they chose not to retain a mental health expert because they believed they could not make an ex parte request for funds and thus would necessarily alert the state to a mental health evaluation, thereby allowing the state to hire a mental health expert of its own. On direct review, the Georgia Supreme Court determined this was an "erroneous impression" on the part of Franks's counsel -- that is, it was legal error to believe they could not request funds on an ex parte basis and to believe seeking a mental health evaluation would automatically open the door to an opposing state expert. Franks, 599 S.E.2d at 148. Franks says that the state habeas court ignored this mistake of law, and that it was contrary to or an unreasonable application of clearly established law to fail to conclude that the legal error by Franks's counsel constituted deficient performance. The problem with Franks's argument is that his trial counsel gave multiple sufficient and alternative bases on which they made the decision to forego a mental health evaluation -- the most important of which was that their investigation revealed no need for one. Franks has not shown by clear and convincing evidence that the state habeas court's factual finding that Franks's counsel decided not to seek a mental health evaluation because they believed there was no good-faith basis to do so was erroneous.

26

were not deficient (and Franks was not prejudiced) by the failure to investigate and present mitigating mental health evidence. That conclusion was neither contrary to nor an unreasonable application of clearly established Supreme Court law, nor was it based on an unreasonable determination of the facts in light of the evidence presented.

First, "[t]he reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions . . . . In particular, what investigation decisions are reasonable depends critically on such information." Strickland, 466 U.S. at 691. Counsel "is not required to seek an independent evaluation when the defendant does not display strong evidence of mental problems." Holladay v. Haley, 209 F.3d 1243, 1250 (11th Cir. 2000).

Franks claims that his counsel overlooked red flags -- his inconsistent statements about the crime and failing grades in his school records -- that should have alerted them to the need for neuropsychological testing. He argues that his inconsistent statements about the crimes to his defense team indicated that his memory was impaired, that he was dissociating, or that there was some other mental health issue that necessitated an evaluation by and the presentation of an expert.

But trial counsel did, in fact, address the gaps in Franks's memory at trial through the presentation of an expert witness. Since Franks was going to testify

27

and there were gaps in his memory, the defense consulted and ultimately called a psychiatrist, Dr. John Connell, in the middle of the trial. Dr. Connell testified that Franks had some features of post-traumatic stress disorder ("PTSD"), explaining that individuals will often repress memories of traumatic events and be unable to recall certain things, but that other aspects of the traumatic experience, like the Dixie Organization threatening to kill his mother, would stick in his mind. Dr. Connell opined that PTSD symptoms like these "would be hard to fake." His testimony supported the defense theory that Franks had not committed any of the murders and that, even if he had harmed the children, which he did not recall, he did so under duress or coercion. Franks's counsel asked Dr. Connell whether he would "expect that somebody who is in a [traumatic situation] could be made to do something they knew was wrong?" Connell responded, "Balancing that with what could occur on the other side if they didn't do something, it could happen, yes."

Franks now also claims that his failing grades in school should have alerted the defense team to the need for a mental health expert. School records indicate that Franks repeated the second and third grades, and that he never progressed past the sixth. The state habeas court found that Franks's mother gave the school records to the defense team, but that they discounted the records because they saw nothing remarkable in them.

28

We have found deficient performance where trial counsel failed to investigate mental health issues that were "overt and fairly apparent to anyone who cared to look closely." Ferrell, 640 F.3d at 1228. But Franks's inconsistent statements and school records, particularly in light of the defense team's extensive interviews with Franks and his family that indicated that there were no significant cognitive deficits or other mental health issues worth pursuing, do not rise to that level. In fact, the red flags in his apparent memory lapses were addressed in the evaluation and testimony of Dr. Connell. And as the state court noted about the school records, "by the time of [Franks's] trial, [he] had owned two separate businesses and had never been diagnosed or even treated for any mental health issues." We cannot say that the state court's determination that counsel made a reasonable, strategic use of mental health evidence at trial after thorough investigation was contrary to or an unreasonable application of clearly established Supreme Court law.

### 3. Franks's Childhood and Substance Abuse

Franks further argues that his trial lawyers were constitutionally ineffective because they failed to present a more detailed account of his difficult childhood and substance abuse. Counsel knew about Franks's abusive father and long history of substance abuse, and they presented some of both themes at trial. Franks himself testified that he was using methamphetamines at the time of the crimes,

29

and his brother, Calvin Franks, testified in some detail that their father terrorized the family.  Collaterally, Homans explained that he made a strategic choice not to focus on Franks's childhood and drug abuse because of his familiarity with Hall County juries and his belief that such a mitigation strategy "was not going to be a winning hand."  Homans explained, "some of the jurors during jury selection had made a point of, you know, of somebody commits murder I don't want to hear a sob story about their childhood.  And that's the kind of thing you get from some of our jurors at home, and so we told [the family] we've got to be careful about trying to blame something for the conduct, we just need to show this is out of character."[3]

The state habeas court concluded that "trial counsel made a reasonable, strategic decision not to focus on [Franks]'s drug use as a mitigating factor at trial."  As we've repeatedly said, "reasonably competent counsel may not present such evidence because a detailed account of a defendant's alcohol and drug abuse is invariably a 'two-edged sword.'"  Stewart v. Sec'y, Dep't of Corr., 476 F.3d 1193, 1217 (11th Cir. 2007) (quoting Housel v. Head, 238 F.3d 1289, 1296 (11th Cir. 2001)).  "Rarely, if ever, will evidence of a long history of alcohol and drug abuse be so powerful that every objectively reasonable lawyer who had the

---

[3] As Franks concedes, at least one venire member indicated that she would not be sympathetic to mitigating evidence about a troubled childhood: "I don't believe there are many excuses for taking another person's life, I would say self-defense, accident, that's about it.  I can't imagine many mitigating circumstances like I had an unhappy childhood so I turned out bad so I killed somebody.  I don't -- I would not be very sympathetic in that regard."  It was not an unreasonable determination of the facts for the state habeas court to credit Homan's testimony.

evidence would have used it." Id. Applying the second layer of AEDPA deference owed to the state court, we conclude that its determination was not an unreasonable determination of the facts in light of the evidence presented, nor was it contrary to or an unreasonable application of clearly established federal law.

## B. Franks Suffered No Prejudice as a Result of Any Alleged Deficiency in his Counsel's Performance.

Perhaps even more clearly, the state court's determination that Franks suffered no prejudice on account of any alleged deficiencies in the performance of his counsel was neither contrary to nor an unreasonable application of clearly established law, nor was it based on an unreasonable determination of the facts in light of the evidence presented. To show prejudice,

> it must be established that, but for counsel's unprofessional performance, there is a reasonable probability the result of the proceeding would have been different. See Strickland, 466 U.S. at 694. "It is not enough for the [petitioner] to show the errors had some conceivable effect on the outcome of the proceeding . . . ," because "[v]irtually every act or omission of counsel would meet that test." Id. at 693. Nevertheless, a petitioner "need not show that counsel's deficient conduct more likely than not altered the outcome in the case." Id. at 693. Rather, where, as here, a petitioner challenges a death sentence, "the question is whether there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." Id. at 695.

Putman v. Head, 268 F.3d 1223, 1248 (11th Cir. 2001) (alterations and ellipses in original); see also Ferguson v. Sec'y for Dep't of Corr., 580 F.3d 1183, 1198–99 (11th Cir. 2009) (noting that Strickland asks if a different result is "reasonably

31

probable," not if it is "possible" (emphases omitted)). Thus, "[i]n assessing prejudice, we reweigh the evidence in aggravation against the totality of available mitigating evidence." Wiggins, 539 U.S. at 534 (emphasis added). We examine all of the good and all of the bad, what was presented during the trial and what was offered later, collaterally. The question is whether, "viewed as a whole and cumulative of mitigation evidence presented originally," there is "'a reasonable probability that the result of the sentencing proceeding would have been different' if competent counsel had presented and explained the significance of all the available evidence." Williams, 529 U.S. at 399. In determining whether a reasonable probability of a different outcome exists -- that is, a probability sufficient to undermine confidence in the outcome -- we presume a reasonable decisionmaker. See Nix v. Whiteside, 475 U.S. 157, 175 (1986) ("[I]n judging prejudice and the likelihood of a different outcome, 'a defendant has no entitlement to the luck of a lawless decisionmaker.'" (alteration adopted) (quoting Strickland, 466 U.S. at 695)).

We start with what is indisputable: the aggravating factors were very powerful. Franks shot two people execution style over drug money in his pawn shop; he drove hours away to attack the wife and two children of one of his victims, abusing the family's trust to gain entry into their home in order to rob the family safe; he stabbed Debbie Wilson and left her to helplessly hear his brutal

32

attacks on her young children; he attacked a thirteen-year-old and a nine-year old;

he evaded law enforcement for nine days; he held an elderly couple hostage in

their sweltering garage; he showed little remorse when he told his brother-in-law

that his pawn-shop victims "got what they deserved"; and when he was finally

apprehended, he attempted to escape from jail.  The weak mitigation evidence

about Franks's abusive childhood, substance abuse, and cognitive deficits

presented collaterally does not create a reasonable probability of a different

outcome.  And most significantly, the state habeas court's determination that there

was no prejudice was neither contrary to nor an unreasonable application of clearly

established Supreme Court law, nor was it based on an unreasonable determination

of the facts in light of the evidence presented.

### 1. Cognitive Deficits

For starters, even if Franks's counsel had discovered and presented the

evidence of cognitive deficits proffered in the postconviction hearing, that

evidence was, as the state habeas court determined, equivocal.  We detail the

postconviction cognitive evidence in order to properly evaluate whether, when

coupled with other, additional mitigating evidence, it would have raised a

reasonable probability that the jury would have recommended life, not death.  The

evidence included the testimony of Franks's mother Doris, school and medical

records from Franks's adolescence and early adulthood, and the expert testimony

of Dr. Daniel Grant, a board-certified neuropsychologist and forensic examiner, and Dr. Todd Antin, a psychiatrist specializing in forensic and addiction psychiatry.

Doris Franks testified that she was sick for the duration of her pregnancy with David, that she lacked prenatal care, and that he was born with hepatitis. The state habeas court found, however, that Franks's "childhood medical records establish that the pediatrician who examined [him] noted [Franks's] mother's pregnancy . . . was 'normal'; that [Franks] weighed eight pounds at birth; and his condition at birth was 'good.'" Doris said David was frequently sick throughout childhood, and at nine months nearly died from a high fever, which caused him to lose his sight in one eye. David also suffered a head injury at age four but did not black out or lose consciousness during the episode. As reflected in his elementary school records, David had difficulty in school, and he was held back in the second and third grades. Doris testified that she had not seen the records before David's habeas counsel showed them to her, and that she was unaware that her son was struggling to that degree in school.

Dr. Daniel Grant evaluated Franks's medical records, performed a complete neuropsychological evaluation, and concluded that Franks suffers cognitive deficits that "could be" linked to traumatic brain injury. Dr. Grant identified cognitive deficits in executive functioning characterized by difficulty with complex tasks,

34

planning, organizing, shifting between tasks, conceptualizing situations and tasks, and problem solving. Franks also exhibited perseveration and inflexibility. But Franks also obtained a full-scale IQ score of 96, placing him within the average range of intelligence. Notably, Dr. Grant testified that the cognitive deficits were not "glaring," "not the kind of thing that makes attorneys hearts palpitate": "there's nothing that really stands out glaring, huge, you know, it's subtleties."

Dr. Grant posited that traumatic brain injury "could" explain the cognitive deficits. Franks's medical records following a car accident at age eighteen indicate a primary diagnosis of "closed head trauma" and describe a seizure Franks suffered at the hospital following the accident. A CAT scan at the time of the accident, however, showed no significant lesions, and an EEG came back normal. Dr. Grant explained that a head injury, combined with loss of consciousness and a seizure, could indicate "ongoing abnormal activity in the brain." He explained that it's not unusual for CAT scans to show no significant damage, and that a normal CAT scan "doesn't mean that there was no residual results." But the state habeas court found that Grant's testimony was weak and equivocal, and that Franks had not been prejudiced by the failure to introduce it.

Dr. Todd Antin likewise evaluated Franks and agreed that Franks exhibits cognitive deficits that could be linked to brain injury. The state habeas court noted that Dr. Antin performed no independent medical testing but instead relied on the

tests conducted by Dr. Grant, met with Franks one time, and did not attempt to make any diagnosis of Franks. Dr. Antin also reviewed school and medical records and testimony about Franks's background. Dr. Antin posited that having sustained a severe fever at nine months, and having been in a car accident at eighteen, might have caused brain damage, and that could explain Franks's cognitive deficits. But Antin's expert report mentioned Franks's head injuries only in passing and did not discuss brain damage extensively, suggesting only that these incidents may have been a contributing factor, along with substance abuse and childhood trauma, to his cognitive deficits as an adult. Antin also testified that he could "pretty accurately say [Franks is] not mentally retarded" and "wasn't insane at the time of the crime," but that his early illness could have affected his brain development, leading to "problems with thinking, with decision making, with planning, with behavior." Ultimately, the state habeas court found Dr. Antin's testimony weak and concluded that Franks had not been prejudiced by the failure to present it.

We have found prejudice in two ineffectiveness cases relating to organic brain damage, but in both cases, the evidence was unequivocal and powerfully contextualized otherwise inexplicable crimes. See Jefferson v. GDCP Warden, 941 F.3d 452 (11th Cir. 2019); Ferrell v. Hall, 640 F.3d 1199 (11th Cir. 2011). Jefferson beat a coworker to death after the two went on a fishing trip, but the jury

never heard "the most powerful explanation for an otherwise inexplicable crime": that Jefferson suffered organic brain damage after being struck in the head and dragged by an automobile when he was just two years old, resulting in chronic headaches, blackout spells that may have been petit mal seizures, and frontal lobe and neurological damage "which likely caused diminished impulse control, irritability and short-temperedness, intermittent outbursts of rage, impaired judgment, and an inability to foresee the consequences of his actions."  Jefferson, 941 F.3d at 456–57, 469.  Eric Ferrell executed his 72-year-old grandmother and fifteen-year-old cousin before walking up the street to his mother's house to fix a cup of hot chocolate and watch television.  Ferrell, 640 F.3d at 1204, 1207.  Similarly, the jury never heard unequivocal expert testimony that Ferrell suffered from a seizure disorder (even suffering one in front of defense counsel at a charging conference), hallucinations, borderline mental retardation, and organic brain damage, including frontal lobe dysfunction characterized by "impaired insight and learning abilities" and tendencies toward "impulsive and explosive behaviors."  Id. at 1206, 1213–14.

In Franks's case, by contrast, the expert testimony was far more equivocal. Dr. Grant said repeatedly that Franks's cognitive deficits were not "glaring" -- "nothing that really stands out glaring, huge"; only "subtleties."  Moreover, Franks's background and the facts of the case powerfully undercut the equivocal

37

expert testimony about Franks's cognitive deficits -- specifically that he suffered from impaired executive functioning, which manifested as an inability to plan or foresee the consequences of his actions.  Franks, of course, demonstrated the capacity to function at a high level.  For one thing, he owned and operated two pawnbroker businesses.  For another, the facts surrounding Franks's extended crime spree reveal a person who acted with presence of mind and foresight -- as the state habeas judge found -- rather than an individual driven primarily by impulse.  After murdering Wilson and Martin gangland style in his pawn shop, he drove two hours across the state to rob Wilson's safe.  He had the presence of mind to trick Jessica Wilson into letting him into the home.  He had the foresight to bring flex ties with him with the intent of immobilizing Debbie Wilson.  He had the presence of mind to send the Wilson children out of the house separately to isolate his victims as he attacked each of them.  He knew enough to ditch Wilson's van and steal clothing and another vehicle in furtherance of his escape from the crime scene.  He had the presence of mind to use a pseudonym as he gambled over the course of several days.  He managed to evade capture at the Red Roof Inn and then hold up the Coopers in an attempt to steal their truck, ultimately taking their daughter's car instead.  And he had the presence of mind to rip the telephone lines out of the walls at the Cooper home, again in order to elude capture.  Indeed, he was careful enough to elude law enforcement for nine days and nearly succeeded

in a jail escape.  This evidence substantially undermined the equivocal expert testimony about Franks's "subtle" cognitive deficits.  It was not unreasonable for the state habeas court to conclude that Franks suffered no prejudice on account of an alleged failure to introduce relatively weak evidence suggesting his inability to plan and impulsivity.

### 2. Childhood and Substance Abuse

Nor was the Petitioner prejudiced by any alleged failure to introduce additional evidence about his tumultuous childhood and drug abuse.  For one thing, this testimony was at least partly cumulative.  As we've noted, Franks's older brother Calvin testified at the penalty phase that their father was an alcoholic and that Calvin slept with a knife near his bed because he lived in fear of their father.  Calvin also detailed abuse suffered by David, recounting one of the more vivid episodes that Doris Franks testified to at the postconviction hearing -- when David's father, Charles Franks, shot a gun between her and David while they were sitting on a couch.

Doris Franks added collaterally that David's father was delusional, erratic, and abusive.  His behavior was punctuated by the threatening use of a firearm, which he carried around the house at all times and would sometimes shoot randomly outside the home.  He once grabbed David's older brother Calvin by the arm and told him he would "blow [his] brains out," dragging him outside and

39

shooting at him and at a neighbor who came out to investigate the commotion. Charles would sometimes tell Doris and David that they "would make pretty corpses."

Doris offered only two new, isolated instances of physical abuse -- one when Charles kicked David, and one when Charles "jumped on" David but David managed to get away. But, as the state habeas court noted, Doris had previously denied that Charles physically abused David, which was documented in Pennington's contemporaneous notes. Moreover, Franks's aunt, Jane Mashburn, told appellate counsel that she had never heard David say he was afraid of his father. The state habeas court also cited Franks's Department of Corrections file that indicated Franks said he was not physically or emotionally abused as a child. The state court also determined that given the passage of time between the Petitioner's childhood and the murders, "it is likely that Petitioner's childhood would have received little, if any, mitigating weight." And at least some of Charles's abusive behavior -- and his family's fear -- was presented during Calvin's penalty-phase testimony. Again, it was not unreasonable for the state habeas court to conclude that the failure to introduce the additional collateral evidence did not prejudice Franks, particularly when weighed against the truly horrific nature of the crimes and the many aggravating circumstances.

Collaterally, the primary evidence regarding Franks's substance abuse came from Dr. Antin. Antin testified that David has a long history of substance abuse, likely linked to a genetic predisposition, and that chronic substance abuse affects neurological development in the areas of memory, intelligence, behavior, and cognition. Dr. Antin opined that because of his drug use at the time of the crimes, Franks was "in a very frenzied and maniacal and paranoid state" and was acting impulsively. Although evidence of substance abuse may be mitigating, it is "invariably a 'two-edged sword'" and "may have the counterproductive effect of alienating the jury." Stewart, 476 F.3d at 1217 (quoting Housel, 238 F.3d at 1296). This is especially so where the primary mitigation theory is residual doubt. As the state habeas court noted, evidence of Franks's "drug use, difficult childhood and learning disability, in addition to being weak mitigating evidence, may have eroded any residual doubt if trial counsel had focused on those issues."

Ultimately, weighing the weak mitigating evidence offered collaterally, along with the mitigating evidence presented at trial, against the parade of aggravating factors -- all of the good and all of the bad, all of the old and all of the new -- does not create a reasonable probability of a different outcome. It does not undermine our confidence that the jury would have sentenced Franks to death, let alone lead us to conclude that the state court's determination about prejudice was contrary to or amounted to an unreasonable application of clearly established law.

41

The Petitioner cites to three Supreme Court cases finding prejudice as a result of counsel's failure to offer mitigating evidence, but in each of the cases the disparity between what was presented at trial and what was offered collaterally was vast. In other words, the balance between the aggravating and mitigating evidence at trial and in postconviction proceedings shifted enormously, so much so as to have profoundly altered each of the defendants' sentencing profiles. In Wiggins v. Smith, for example, trial counsel introduced no evidence about Wiggins's tragic life history, which the postconviction record demonstrated was marked by "severe privation and abuse in the first six years of his life while in the custody of his alcoholic, absentee mother," followed by "physical torment, sexual molestation, and repeated rape during his subsequent years in foster care." 539 U.S. at 535. In Williams v. Taylor, trial counsel put on almost no mitigation case, calling witnesses who testified only generally that Williams was a "nice boy" and not violent, while the postconviction evidence "dramatically described mistreatment, abuse, and neglect during his early childhood" and also contained testimony "that he was 'borderline mentally retarded,' had suffered repeated head injuries, and might have mental impairments organic in origin." 529 U.S. at 369–70. In Porter v. McCollum, trial counsel put on nothing in mitigation except "inconsistent testimony about Porter's behavior when intoxicated and testimony that Porter had a good relationship with his son," while the postconviction record revealed a

severely abusive childhood, including routinely witnessing his father beating his mother, as well as being the repeated target himself of his father's violence, along with a heroic and decorated record of military service that left him with post-traumatic stress disorder and brain damage.  558 U.S. 30, 32–36 (2009) (per curiam).

In sharp contrast, the weak mitigating evidence about Franks's childhood and substance abuse presented collaterally would barely have altered his sentencing profile.  And there is no reasonable probability, after reweighing the aggravating and mitigating evidence, of a different outcome.  The state court's determination that Franks suffered no prejudice from the omission of this evidence or from his counsel's primary reliance on residual doubt is neither contrary to nor an unreasonable application of clearly established Supreme Court law, nor was it based on an unreasonable determination of the facts in light of the evidence presented.

We, therefore, **AFFIRM** the district court's denial of Franks's § 2254 habeas petition.